# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00247-CV

**Curtis Raymond, Appellant**

**v.**

**Marcel Rahme and Williams Investments, Appellees**

### FROM THE COUNTY COURT AT LAW NO. 1 OF TRAVIS COUNTY
### NO. 245,228, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING

Appellant Curtis Raymond (ARaymond@) appeals from the trial court=s judgment in favor of appellees Marcel Rahme and Williams Investments (collectively ARahme@). Raymond was the concrete subcontractor on a construction project to build a gas station on Rahme=s property. After a payment dispute arose, Raymond attempted to file and sue on a mechanic=s and materialman=s lien against Rahme=s property. *See* Tex. Prop. Code Ann. '' 53.001-.260 (West 1995 & Supp. 2002). Rahme counterclaimed for breach of contract, breach of warranty, and violations of the Deceptive Trade Practices Act (the ADTPA@). *See* Tex. Bus. & Com. Code Ann. '' 17.01-.854 (West 1987 & Supp. 2002). After a bench trial, Rahme was awarded $65,332 on his counterclaims. Raymond appeals, contending the trial court erred in finding that Raymond (1) failed to properly perfect his mechanic=s lien, (2) breached the construction contract, and (3) breached express and implied warranties. Raymound also contends the trial court erroneously found that Rahme incurred DTPA damages. We will affirm in part and reverse and render in part.

Rahme owns land in Pflugerville. He hired JMT, Inc. as a general contractor for a project to build a gas station on his property. JMT and Raymond entered into an oral contract for Raymond to do the concrete work on the project. Starting in September 1996, Raymond performed various work related to the concrete work. When JMT did not pay Raymond all of the fees he asserted he was owed, Raymond ceased work on the project. Raymond wrote Rahme a letter dated February 5, 1997, stating he was owed $15,211.85. On February 8, 1997, Raymond completed and signed a Mechanic=s and Materialman=s Lien Affidavit; however, that affidavit was not filed in the county records. On April 4, 1997, Raymond signed and filed a second affidavit, alleging a $15,211.85 lien, and sent a copy of the affidavit with a demand for payment to Rahme and JMT.

When Rahme and JMT did not pay, Raymond sued them for breach of contract and sought to foreclose on the lien. Rahme answered that Raymond had not used the proper grade or thickness of concrete and had improperly poured and graded the concrete. Rahme alleged that Raymond=s poor work led to substantial pooling of rainwater and premature cracking and would necessitate the removal and replacement of the defective concrete. Rahme asserted counterclaims for breach of contract, breach of express and implied warranties, and DTPA violations. Raymond entered into an agreement with JMT under which JMT agreed to pay Raymond $6,900, nonsuited JMT, and proceeded to trial against Rahme.

After a bench trial, the trial court rendered a judgment that Raymond take nothing on his claims against Rahme and ordered Raymond=s lien extinguished. Rahme was awarded $65,332 in damages and attorney=s fees on his counterclaims, with further conditional attorney=s fees to be

2

awarded should Raymond appeal. On Raymond=s request, the trial court filed findings of fact and conclusions of law, many of which Raymond attacks on appeal.

## Standard of Review

A trial court=s findings of fact in a bench trial are reviewed for legal and factual sufficiency under the same standards used to review a jury=s verdict on jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Westech Eng=g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 195 (Tex. App.CAustin 1992, no writ). In considering legal sufficiency, we consider all the evidence in the light most favorable to the prevailing party, indulging every inference in that party=s favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998); *Westech Eng=g*, 835 S.W.2d at 196. In reviewing factual sufficiency, we consider all of the evidence and uphold the finding unless the evidence is too weak to support it or the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *Westech Eng=g*, 835 S.W.2d at 196. For issues on which the appealing party had the burden of proof at trial, the party must both prevail on a legal sufficiency challenge *and* demonstrate that the evidence conclusively establishes the issue in his favor as a matter of law. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Cohn v. Commission for Lawyer Discipline*, 979 S.W.2d 694, 696 (Tex. App.CHouston [14th Dist.] 1998, no pet.). We will not substitute our judgment for that of the trial court merely because we might reach a different conclusion. *Cohn*, 979 S.W.2d at 696; *Westech Eng=g*, 835 S.W.2d at 196.

A trial court=s conclusions of law are reviewed *de novo* and will be upheld if they can be sustained on any legal theory supported by the evidence. *Cohn*, 979 S.W.2d at 697; *Westech Eng=g*,

835 S.W.2d at 196. Even if we find a conclusion of law is incorrect, we will not reverse a judgment if it can be sustained by any correct legal theory supported by the evidence. *Cohn*, 979 S.W.2d at 697; *Westech Eng=g*, 835 S.W.2d at 196.

## Summary of the Evidence

Raymond testified that in September 1996 he submitted a bid to JMT for concrete work that included erosion control, a retention pond, curbs and gutters, a dumpster enclosure, driveways, the slab, approaches, outlet structure, and sidewalks. However, JMT did the Adirt work, the culverts, the approaches, and the retention pond.@ Raymond testified that JMT was in charge of compacting the base materials over which the concrete was poured. Raymond did not contract with Rahme, but only with JMT.

Raymond said no inspector was present when the concrete was poured; only he, his crew, and Rahme were present. Raymond poured the building foundation and the sidewalk before beginning on the driveway and parking lot areas. At the time Raymond began pouring the driveway, he had not been furnished with any design plans or specifications for that area, so he Ajust started out as a regular commercial job and set the forms right at 5 inches thick.@ He said five inches is standard for this kind of job unless the concrete is poured over tanks or will sustain heavy truck traffic, in which case it should be thicker. When Raymond had almost completed the first pour of the driveway, Rahme complained that it was not thick enough and was not the Aproper strength of concrete.@ Raymond said, AOf course, I didn=t know what he was talking about, so we finished that pour out and from that pour on, we did exactly what he told me to do. I made the concrete 6 inches thick, and I poured the 4000 [pounds per square inch (Apsi@)].@ Raymond said when he realized the

4

first section of the driveway was too thin, he told Rahme that A[i]nstead of the one year warranty after I was completed, I would give him an additional one year warranty in case C that would give him time for his store to be opened, and if any trucks came through there, I didn=t know which way the trucks would be, you know, coming through to fill up.  If the thing cracked or whatever, then I=d be responsible for it.@

Raymond testified that although photographs taken during various pours do not show spacers under the steel reinforcing bars (rebar) to keep the rebar from lying flat on the ground, the photographs were taken before the concrete was poured, while Raymond and his crew were still preparing the rebar.  Raymond said that the concrete was poured over the rebar and then the rebar was pulled up into the concrete.  He also said spacers were placed under the rebar to keep it from being pushed flat by the concrete.  Because the sidewalk was only a walking surface and not structural, it was reinforced with wire mesh, not rebar.  He said it is not as critical in a driveway or parking lot to have as many spacers under the rebar as in a foundation pour.  Raymond testified that he took pains to make sure the concrete was level and believed he performed his work properly.

Raymond said he did not know that Rahme was complaining about pooling or any other problems until after Raymond filed his lawsuit.  Raymond said he met with Rahme Ato attempt to satisfy him and obtain payment,@ and that at first Rahme only complained about pooling in one area.  Raymond examined the A20 foot area@ and said the low spot was between three-eights to one-half an inch lower than the surrounding areas; the normal tolerance on concrete is about one-quarter of an inch along ten feet of concrete.  Raymond said the low spot was Aright on the line@ of industry standards.  Raymond also said the concrete Ahas standard stressed cracks@ that would occur in any

5

kind of parking lot, not cracks that indicate the concrete is defective. Raymond offered to fix the defects and to extend an unconditional warranty at no charge to Rahme, but Rahme rejected the offer.

Raymond testified that he had an engineer take core samples from the concrete he poured. The samples showed the concrete=s strength was between 6,540 and 8,190 psi, and it was mostly within a ten-percent tolerance of five inches, the industry standard, in the first driveway section poured, and between 5.7 and 6.4 inches deep in the other sections, within the tolerance for a six-inch pour. Raymond admitted that in a small area of the first section, the concrete was only 3.5 inches deep, well outside the ten-percent tolerance on five inches. Raymond offered an additional one-year warranty on the shallow portion.

Raymond testified that he quit when the job was about seventy-percent complete because JMT had not paid him. Rahme was on-site when Raymond quit and asked why Raymond was leaving. Raymond explained that he had not been paid. Rahme told Raymond A[t]hat he would get it straightened out,@ but Raymond was never paid. Raymond was asked, AIsn=t it true that no work was performed on the job anytime after November?@ He answered, AI would assume.@

Rahme testified that he was on the site when Raymond and his crew began pouring the concrete. He said:

> I had no experience in construction. But I saw that there is something that=s not going good like the rebar going underground and all that stuff, and they are pouring concrete on top of the rebar without putting [spacers] or something to sustain the rebar in the middle of the concrete. And then I thought the thickness of the concrete, it=s not the same that we have on the contract.

6

Although Raymond testified that his crew would have used spacers in the driveway and parking lot, Rahme testified that he witnessed the pours and that there were no spacers under those areas; Rahme did see Raymond=s crew use spacers during the foundation pour. Rahme testified that most of the concrete was defective because there were water pools in the pump bays, in front of the store, and on the whole area south of the store where the concrete was poured five inches deep. Rahme said water collects around the pumps about three-quarters of an inch deep. He said water collects around four of the six pump bays, and is a significant problem in two of those four bays. Rahme=s store is busy, but he loses customers Afrom the pump where we have a lot of water.@

Rahme said when he met with Raymond to show him the pooling, Raymond Anever offered to fix the [problem]. He want [sic] his money first and do some little job.@ When Raymond told Rahme that he would score the concrete with drain lines, Rahme said, AI asked him if we can put what he=s saying in written contract [sic] and be legal, that if we damage more [sic] the concrete and he has to remove all the concrete and put [sic] new concrete. He didn=t accept it. And his lawyer said that it=s going to cost a lot of money.@ Rahme said he refused to let Raymond attempt to fix the concrete because he was afraid that it would further damage the concrete. Rahme testified that several people told him that Raymond=s proposal would not fix the pooling and that the concrete had to be removed and repoured. To repair the defective concrete, Rahme will have to close the store during the repairs. Rahme thought it would take about two weeks to do the repairs; Raymond thought it would take about four days.

Rahme testified that A[t]he last time that [Raymond] did work over there, it=s November—late November not after that.@ Rahme said he was not aware that Raymond had not

been paid until Aafter maybe February or May, something like that.@ At the time Raymond quit, Rahme did not know that it was over a money dispute.

George Pulliam, a licensed professional engineer, testified as an expert witness. Pulliam visited the site three times, once after a heavy rain, and reviewed concrete samples and plans, contracts, and photographs from the construction. Pulliam said there was a large pond of water in front of one bay, pools in front of three other bays, and uncompacted or improperly-compacted base material under the parking lot area. Pulliam said that Raymond=s proposals to score drain lines or to pour self-leveling concrete would not cure the problem. He said self-leveling concrete would probably flake and crack along the edges and would only transfer the water to another area, Afrom one pond, to another pond, to another pond.@ Pulliam thought the whole driveway area would have to be removed and repoured. Pulliam said water pooling in the pump bays is especially hazardous because gasoline or oil spilled on top of water is very slippery. Pulliam said that there were insufficient spacers in the foundation and that there did not appear to be any spacers in the driveway and parking areas, which meant the concrete was not reinforced and would not perform properly. Pulliam said he had seen Raymond=s work on other jobs, and A[g]enerally, he does excellent work.@ On this job, however, Pulliam said Raymond=s work did not meet the standards of good and workmanlike performance. Pulliam took issue with Raymond=s decision to pour the concrete without first having an inspector or engineer ensure that the underlying base materials were properly compacted. He said the improperly compacted materials would damage the parking area Awithin a relatively short period of time@ because, as vehicles drive over it, the base will compact further and the concrete will start to disintegrate. Pulliam did not know whether Raymond ever saw the construction plans that indicated

**8**

the compaction specifications, but from the photographs taken during the pours, Ait=s obvious that the subgrade underneath the area where the concrete is being placed is not compacted properly. If it were, it would be virtually flat and no chunks of dirt visible and showing.@ In Pulliam=s opinion, Raymond should have waited until the base had been properly compacted so that there were no visible dirt clods. Pulliam also testified that the photographs show Raymond=s workers standing directly on top of rebar as they poured concrete, thus pushing it flat against the ground. Pulliam said he saw signs that the concrete was beginning to disintegrate, saying that Ainitial shrinkage cracking@ can lead to disintegration as vehicles travel over concrete. He was asked, ASo what you=re talking about right now is shrinkage cracking?@ Pulliam answered, ASome of them appear to be shrinkage cracks, others are becoming what I would classify as aggravated shrinkage cracks in that they=re getting considerably larger than what I classify as shrinkage cracks.@ Pulliam admitted that he did not mention any such disintegration or cracking in his written report, which he termed Apreliminary.@

### Did Raymond Perfect His Lien?

In his first issue on appeal, Raymond argues that the trial court erred in concluding that he failed to perfect his lien, attacking the following conclusions of law: (1) Raymond failed to perfect his claimed liens; (2) his lien against Rahme=s property is invalid; (3) Raymond is not entitled to a judgment foreclosing his alleged lien against Rahme=s property; and (4) Raymond should take nothing from Rahme.

Chapter 53 of the Property Code governs mechanic=s and materialman=s liens. *See*

**9**

Tex. Prop. Code Ann. '' 53.001-.260 (West 1995 & Supp. 2002).[1] A person who provides labor or materials to construct a building or improvement under a contract with the property owner, the owner=s agent, or an original contractor is entitled to a lien against that property. Act of May 26, 1983, 68th Leg., R.S., ch. 576, ' 1, 1983 Tex. Gen. Laws 3475, 3535, *amended in part by* Act of May 24, 1995, 74th Leg., R.S., ch. 851, '' 1, 6, 1995 Tex. Gen. Laws 4279, 4279-80 (amended 1999) (current version at Tex. Prop. Code Ann. ' 53.021(a) (West Supp. 2002)). A subcontractor is considered a derivative claimant and must rely on his statutory lien remedies. *First Nat=l Bank v. Sledge*, 653 S.W.2d 283, 285 (Tex. 1983) (discussing earlier versions of lien statutes); *Stolz v. Honeycutt*, 42 S.W.3d 305, 310 (Tex. App.CHouston [14th Dist.] 2001, no pet.). A subcontractor may seek recovery from Atrapped@ funds held by the property owner or funds Aretained@ by the owner. *Sledge*, 653 S.W.2d at 286; *Stolz*, 42 S.W.3d at 310; *Hadnot v. Wenco Distribs.*, 961 S.W.2d 232, 234 (Tex. App.CHouston [1st Dist.] 1997, no writ). ATrapped@ funds are funds not yet paid to the original contractor at the time the property owner receives notice that a subcontractor has not been paid; on receiving such notice, the owner may withhold those funds from the original contractor until the claim is paid or settled or until the time during which a subcontractor may file a lien affidavit has passed. *See* Act of May 26, 1983, 68th Leg., R.S., ch. 576, ' 1, 1983 Tex. Gen. Laws 3475, 3543-44, *amended in part by* Act of May 28, 1989, 71st Leg., R.S., ch. 1138, ' 12, 1989 Tex. Gen. Laws 4693,

---

[1] Portions of the Property Code were amended in 1997 and 1999, but those amendments only apply to contracts entered into after the amendments= effective dates. *See* Act of May 21, 1999, 76th Leg., R.S., ch. 889, ' 13, 1999 Tex. Gen. Laws 3586, 3591 (1999 amendments apply only to contracts entered into after September 1, 1999); Act of May 19, 1997, 75th Leg., R.S., ch. 526, ' 25, 1997 Tex. Gen. Laws 1880, 1892 (1997 amendments apply only to contracts entered into after September 1, 1997). We will cite to the versions of the statutes in effect at the time the parties entered into these contracts.

4697 (amended 1997) (current version at Tex. Prop. Code Ann. ' 53.081 (West Supp. 2002)); Tex. Prop. Code Ann. ' 53.082 (West 1995); *Stolz*, 42 S.W.3d at 311; *Hadnot*, 961 S.W.2d at 235. ARetained@funds are funds withheld from the original contractor either under a contractual agreement or under section 53.101, which requires a property owner to retain ten percent of the contract price for thirty days after the project is completed. *See* Tex. Prop. Code Ann. '' 53.025, .101 (West 1995); *Stolz*, 42 S.W.3d at 311; *Hadnot*, 961 S.W.2d at 234.

To perfect a lien, a claimant must substantially comply with subchapter C of chapter 53. Tex. Prop. Code Ann. ' 53.051 (West 1995); *Sledge*, 653 S.W.2d at 285. A subcontractor must give the property owner notice of the debt no later than Athe 15th day of the third month following each month@in which the subcontractor worked or provided materials. Act of May 26, 1983, 68th Leg., R.S., ch. 576, ' 1, 1983 Tex. Gen. Laws 3475, 3540-41, *amended in part by* Act of May 28, 1989, 71st Leg., R.S., ch. 1138, ' 8, 1989 Tex. Gen. Laws 4693, 4696 (amended 1997) (current version at Tex. Prop. Code Ann. ' 53.056 (West Supp. 2002)). The notice to the owner must include a warning stating that the owner may be held personally liable and his property subjected to a lien unless he withholds payments from the original contractor or the subcontractor=s claim is paid or settled. Act of May 28, 1989, 71st Leg., R.S., ch. 1138, ' 8, 1989 Tex. Gen. Laws 4693, 4696 (current version at Tex. Prop. Code Ann. ' 53.056(d)). If the subcontractor does not give the owner timely notice containing the statutory warning, the lien is invalid. Act of May 26, 1983, 68th Leg., R.S., ch. 576, ' 1, 1983 Tex. Gen. Laws 3475, 3540 (current version at Tex. Prop. Code Ann. ' 53.056(a)); *Sledge*, 653 S.W.2d at 287; *Brown v. Dorsett Bros. Concrete Supply, Inc.*, 705 S.W.2d 765, 766 (Tex. App.CHouston [14th Dist.] 1986, no writ).

A subcontractor must also file a lien affidavit with the clerk of the county in which the property is located no later than Athe 15th day of the fourth calendar month after the day on which the indebtedness accrues.@ Act of May 28, 1989, 71st Leg., R.S., ch. 1138, ' 4, 1989 Tex. Gen. Laws 4693, 4694 (amended 1997) (current version at Tex. Prop. Code Ann. ' 53.052(a) (West Supp. 2002)); *Hadnot*, 961 S.W.2d at 235. An indebtedness to a subcontractor accrues on Athe last day of the last month in which the labor was performed or the material furnished.@[2] Tex. Prop. Code Ann. ' 53.053(c) (West Supp. 2002).

---

[2] Raymond contends he had a later deadline to file his affidavit because he sought a retainage lien and section 53.053(e) provides that A[a] claim for retainage accrues on the last day of the month in which all work called for by the contract between the owner and the original contractor has been completed, finally settled, or abandoned.@ Tex. Prop. Code Ann. ' 53.053(e) (West Supp. 2002). However, Aretainage@ as defined by chapter 53 Adoes not include retainage under Subchapter E@ (the retainage statute). *See* Act of May 26, 1983, 68th Leg., R.S., ch. 576, ' 1, 1983 Tex. Gen. Laws 3475, 3534 (amended 1997) (current version at Tex. Prop. Code Ann. ' 53.001(11) (West Supp. 2002)). Raymond agrees that the definition of Aretainage@ refers to contractual retainage agreements, not to statutorily-required retainage, and admits that sections 53.025 (ALimitation on Ordinary Retainage Lien@) and 53.057 (ADerivative Claimant: Notice for Contractual Retainage Claim@) apply only to contractual retainage and not to his claims. We believe section 53.053(e) also applies to contractual retainage, and Raymond gives no explanation or authority to support his contrary assertion. We hold that Raymond=s debt accrued according to section 53.053(c).

Raymond contends that the evidence shows he provided work and materials Abetween September 1996 and February 1997.@ However, at trial Raymond was asked, AIsn=t it true that no work was performed on the job anytime after November?@ Raymond answered, AI would assume.@ Rahme testified, AThe last time that he did work over there, it=s November B late November not after that.@ There was no evidence to show Raymond worked on the project after November 1996. Therefore, the debt accrued on November 30, 1996. *See id.* To assert a valid lien, Raymond had to file his lien affidavit no later than March 15, 1997. Raymond=s affidavit, filed on April 4, 1997, was not timely filed and is invalid. Furthermore, Raymond was required by law to give Rahme notice containing the statutory warning no later than February 15, 1997. On February 5, 1997, he sent a letter to Rahme stating he was owed $15,211.85. Raymond argues that the subject line of that letter, reading, ARe: Intent to file lien on Pflugerville Convience [sic] Store,@ constituted the required statutory warning. We disagree. Among other reasons, neither the subject line nor anything else in the letter gives Rahme notice that he could be subjected to personal liability if he failed to withhold funds from JMT.

Raymond did not give Rahme timely notice of the debt that contained the required statutory warning and did not timely file his lien affidavit. The trial court did not err in concluding that Raymond failed to perfect his claimed lien. We overrule his first issue on appeal.

### Rahme=s Breach of Contract Claims

In his second issue on appeal, Raymond contends that the trial court erred in finding that he breached the underlying contract and failed to substantially complete the concrete work.[3]

---

[3] Although Raymond frames his second issue as an attack on the evidence showing he breached

the construction contract, he also argues that he never entered into a contract with Rahme and can only be held accountable for alleged breaches of his contract with JMT, the controlling issue on this point.

A person who is not party to a contract may not recover for breach of contract unless the person is a third-party beneficiary to the contract, meaning the contracting parties intended to secure some benefit to the third party and entered into the contract directly and primarily for the third party=s benefit. *Thomson v. Espey Huston & Assocs., Inc.*, 899 S.W.2d 415, 418 (Tex. App.CAustin 1995, no writ). The law provides a presumption against third-party beneficiary agreements, and any doubts must be resolved against finding a third-party beneficiary. *Id.* Contracts between property owners, general contractors, and subcontractors are governed by general contract principles; absent clear evidence to the contrary, a property owner is not considered a third-party beneficiary of a contract between a general contractor and a subcontractor. *Id.* at 419-20. Mere knowledge that the property owner will benefit from the contract is insufficient to establish a third-party beneficiary arrangement. *Id.* at 420.

Rahme did not have a contractual relationship with Raymond. JMT contracted with Raymond and Rahme in turn contracted with JMT. Rahme was not a party to and there is no evidence to support a finding that he was a third-party beneficiary of Raymond=s contract with JMT. Rahme in fact denied having a contract with Raymond, and the trial court sustained Raymond=s objection to Rahme=s attempt to show he was a third-party beneficiary to Raymond=s contract with JMT. Rahme could have sued JMT for breach of contract but did not do so.[4] JMT in turn could have sued Raymond for breach of contract. Lacking any privity of contract with Raymond, Rahme cannot recover from Raymond for breach of contract. We sustain Raymond=s second issue on appeal.

---

[4] Rahme said he considered suing JMT but decided against it because JMT has gone bankrupt.

15

**Rahme=s Express and Implied Warranty Claims**

In his third issue on appeal, Raymond contends the trial court erred in finding that he made and then breached express and implied warranties to Rahme that the concrete work would be performed in a good and workmanlike manner, attacking the following findings of fact: (1) Raymond made express and implied warranties to Rahme that the concrete work would be performed in a good and workmanlike manner; (2) Rahme reasonably relied on Raymond=s express and implied warranties; (3) Raymond failed to perform the concrete flatwork in a good and workmanlike manner; and (4) Raymond=s conduct was a breach of the express and implied warranties with respect to his work.

An express warranty is created when a promise related to the goods is made by the seller to the buyer and becomes a part of the basis of the bargain. *Harris Packaging Corp. v. Baker Concrete Constr. Co.*, 982 S.W.2d 62, 66 (Tex. App.CHouston [1st Dist.] 1998, pet. denied); *see Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 890-91 (Tex. App.CSan Antonio 1996, writ denied). An express warranty exists only Aif express representations form the basis of the bargain.@ *Harris Packaging*, 982 S.W.2d at 66; *see Chilton Ins. Co.*, 930 S.W.2d at 890-91. Generally, a statement made by a seller after a contract has been made is not an express warranty because the buyer has already agreed to the bargain and cannot argue that he relied on the statement in entering into the contract. *Harris Packaging*, 982 S.W.2d at 67. However, a post-contract statement that modifies a pre-existing contract may be considered an express warranty. *Id.*

Raymond gave JMT an express one-year warranty, and in December 1996 he wrote JMT a letter stating, AI am willing to warrant the driveway against major cracking. It will be warranted for one year from date of pour. This warrant will not include stress cracks or other minor

cracking.@ Raymond admitted that he extended his normal one-year warranty period to two years after he realized the first section of driveway was not poured deep enough.[5]

Raymond=s express two-year warranty expired in December 1998. Raymond repeatedly testified that he did not become aware of any of Rahme=s complaints until after he filed suit in March 1999, and Rahme did not testify to the contrary. Further, Rahme did not testify that he suffered major cracking within the two-year warranty period and, in fact, did not testify about cracking at all. Rahme testified only about water pooling and complained that he did not receive what he contracted for because the first section of driveway was only poured five inches thick. The only evidence regarding cracking was Pulliam=s statement that A[s]ome of them appear to be shrinkage

---

[5] On May 5, 2000, Raymond sent Rahme an AUnconditional Offer to Cure Claimed Defects,@ and said:

> As to the concrete at the south end of [Rahme=s] property, which was inadvertently poured at a different depth than called for in the contract between the general contractor and [Rahme], [Raymond] agreed to offer and did offer an additional year of warranty on that portion of the job. Notwithstanding that during the two-year warranty period there were no complaints of cracking of the parking lot slab, [Raymond] is willing to warranty the south end of the concrete lot against cracking or separation exceeding 1/4 inch in width for as long as [Rahme] owns the entire property.

Rahme rejected Raymond=s offer to cure.

cracks, others are becoming what I would classify as aggravated shrinkage cracks in that they=re getting considerably larger than what I classify as shrinkage cracks.@ There is no evidence in the record to show the concrete had suffered Amajor cracking,@ nor is there evidence that any such cracking occurred during the two-year warranty period.

Raymond did not testify that he extended a blanket warranty; the letter written to JMT regarding the warranty explicitly warrants the concrete against Amajor cracking.@ Furthermore, the warranty was extended for two years, expiring in December 1998. There was no testimony about when Rahme began experiencing problems with the concrete, much less when any Amajor cracking@ occurred. Raymond=s express warranty extended only as far as his Aexpress representation.@ *See Harris Packaging*, 982 S.W.2d at 66. The evidence does not support a finding that Raymond breached an express warranty.

As for Rahme=s implied warranty claims, we recently held that a property owner may not recover under an implied warranty theory from a subcontractor with whom the owner has no direct contractual relationship. *Codner v. Arellano*, 40 S.W.3d 666, 672-74 (Tex. App.CAustin 2001, no pet.); *see also Harris Packaging*, 982 S.W.2d at 67 (no implied warranty for a particular purpose where no contract between parties). We held that because a property owner has recourse against the general contractor with whom he contracted, there is no compelling public policy reason to impose an implied warranty against a subcontractor. *Codner*, 40 S.W.3d at 674. The evidence does not support the trial court=s finding of an implied warranty between Raymond and Rahme.

Because the evidence is legally insufficient to support the trial court=s findings that Raymond made and breached express or implied warranties of good and workmanlike conduct, we sustain Raymond=s third issue.

**18**

### Rahme=s DTPA Claims

In his fourth issue on appeal, Raymond argues the trial court erred in concluding that Rahme incurred damages under the DTPA, attacking the following findings of fact: (1) Raymond=s breach of warranty and failure to perform was a producing cause of economic damages to Rahme; (2) the removal and replacement of 9,460 square feet of concrete is necessary as a result of Raymond=s breach; and (3) Rahme suffered economic damages for the cost of repair and replacement of the concrete flatwork in the amount of $39,732.00 (using a stipulated cost of $4.20 a square foot).

The DTPA does not create a warranty; to recover under the DTPA, a complaining party must show a breach of an express or implied warranty recognized in common law or created by statute. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex. 1995); *La Sara Grain Co. v. First Nat=l Bank*, 673 S.W.2d 558, 565 (Tex. 1984); *Codner*, 40 S.W.3d at 672. Having held that the record does not support findings that Raymond made implied warranties or breached an express warranty, we hold the trial court erred in finding Rahme was entitled to recover under the DTPA. We sustain Raymond=s fourth issue.

### Conclusion

We hold the trial court did not err in finding Raymond failed to perfect his claimed mechanic=s lien but that the trial court did err in finding Rahme was entitled to recover for breach of contract, breach of implied or express warranty, or DTPA damages. Accordingly, we affirm the trial court=s judgment that Raymond take nothing on his claims against Rahme; we reverse the portion of the judgment awarding Rahme damages against Raymond, and render judgment that Rahme take nothing on his counterclaims against Raymond.

_____

Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Yeakel

Affirmed in Part; Reversed and Rendered in Part

Filed:   May 2, 2002

Publish