# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00537-CV

**Kendall Builders, Inc., Appellant**

**v.**

**Jane Chesson and Phillip J. Cullen, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT
### NO. GN-202292, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING

## O P I N I O N

This appeal arises from a dispute between a married couple, appellees Jane Chesson and Phillip J. Cullen, and a building contractor, appellant Kendall Builders, Inc. (Kendall), whom appellees hired to remodel a home they had purchased in Austin. Before the remodeling was completed, appellees became dissatisfied with Kendall's work and fired the contractor. Appellees and Kendall asserted damage claims against each other, which were arbitrated and then litigated before the district court. Our issues on appeal concern whether the district court erred in (1) setting aside an arbitration award in favor of Kendall on the basis of evident partiality; (2) finding that appellees' Austin property was homestead property exempt from liens Kendall had placed on it; and (3) awarding attorney's fees. We affirm the judgment in part and reverse in part.

## BACKGROUND

**The dispute**

Before moving to Austin, appellees lived in California with their five children. The family sought to relocate to Austin after the company with which Cullen was employed was acquired by Vignette Corporation and he was transferred to Austin. Appellees bought a house in Austin that needed substantial remodeling to accommodate their family. Soon thereafter, appellees contracted with an interior decorator. The interior decorator recommended Kendall to perform the renovation. On November 10, 2000, Chesson entered into a contract with Kendall whereby the contractor would handle the remodeling.

This contract had several features that bear upon our analysis of the issues. First, it contained an arbitration clause, which the parties do not appear to dispute is governed by the Texas Arbitration Act[1] rather than its federal counterpart.[2] Second, it is undisputed that the manner in which the contract was executed did not satisfy the requirement for fixing liens on Texas homestead property because, among other things, only Chesson, and not Cullen, signed the agreement.[3]

The family had claimed its California home as a homestead for seven years. During the remodeling, Cullen moved to Austin, initially lived in an apartment away from the Austin property, and then later moved into the garage apartment on the Austin property. Meanwhile,

---

[1] Tex. Civ. Prac. & Rem. Code Ann. § 171.001-171.098 (West 1997 & Supp. 2004).

[2] Federal Arbitration Act, 9 U.S.C.A. §§ 1, 2 (West 1999).

[3] *See infra* n. 12.

2

Chesson and the couple's five children remained in California. However, even before entering into the contract with Kendall, in addition to hiring the decorator, appellees registered to vote (and voted) in Austin, obtained Texas driver's licenses, had their car shipped to Austin and registered in Texas, opened a joint checking account in Austin for which they listed the Austin property as their home address, and made donations to Austin charities.

Several months into the remodeling, appellees became dissatisfied with Kendall's work and terminated the contract. After the termination, Kendall claimed that its work had been substantially completed and that appellees owed it $42,897.66 for labor and materials it furnished. Appellees disputed this claim and asserted that it would take $90,000 to fix damage that Kendall had caused. Kendall placed liens on appellees' Austin property to secure the amounts it claimed for labor and materials. *See* Tex. Prop. Code Ann. § 53.254 (West Supp. 2004).

**The arbitration**

Pursuant to the contract, the parties went to arbitration to resolve their dispute. The parties agreed not to submit to the arbitrator any complaint relating to Kendall's liens. Under the governing American Arbitration Association (AAA) rules, the parties selected a neutral arbitrator from an AAA-approved list. The arbitrator held a hearing spanning three days. Approximately one month later, the arbitrator awarded Kendall most of the sums it sought and nothing to appellees.

Initially, as the parties prepared to go to arbitration, only Chesson and Kendall were parties. This was consistent with the underlying contract, which had been signed by only Chesson and not Cullen. Correspondence and information regarding the arbitration were sent only to

3

Chesson. This included a letter directly from the AAA notifying Chesson of the need to choose an arbitrator and directing her to its website which outlined AAA rules and procedures for choosing the arbitrator. Cullen was added as a party only later, but prior to the arbitration hearing.

During a break in the arbitration, the arbitrator mentioned to Cullen that he had purchased stock at seven or eight dollars a share from Vignette, Cullen's employer, and asked whether the stock was "ever going to go up." At that time, Vignette's stock was trading for around two dollars a share.[4] Neither Chesson nor the couple's lawyer was present. Cullen later recounted the exchange to his wife "a couple of days later." Twenty-eight days after the exchange occurred, the arbitrator issued the award.

Only after the unfavorable award was issued did appellees mention to their lawyer Cullen's exchange with the arbitrator. Appellees' lawyer deposed the arbitrator and discovered that the arbitrator had lost over $5,000 due to a decrease in Vignette's stock price, approximately a 1% decrease in the arbitrator's net worth.

**Trial court proceedings**

After their investigation concerning the arbitrator's interest in Vignette, appellees filed an application to vacate the arbitration award alleging "evident partiality" of the arbitrator. Kendall counterclaimed seeking to confirm the award and foreclose on its liens on appellees' property. Appellees responded with a motion to remove the liens, claiming that their Austin property was their homestead as of the date that the liens were recorded. Because it is undisputed that

---

[4] Cullen had previously testified he worked for Vignette.

4

Kendall did not follow the procedures that would have enabled it to place liens on homestead property, the issue of homestead status alone controlled the validity of the liens. Appellees also sought attorney's fees.

All claims were tried to the court. Two evidentiary issues arose during the bench trial. First, in attempting to demonstrate evident partiality, appellees sought to introduce evidence through Cullen that "[i]nvestors in general were very upset with Vignette" because of the company's stock performance. Kendall objected on hearsay grounds. The trial court permitted the testimony for the limited purpose of establishing "the effect upon Mr. Cullen." Second, after a dispute regarding whether appellees could prove up attorney's fees through their counsel, appellees did not present evidence on attorney's fees but instead urged the trial court to take judicial notice of a reasonable sum.

The district court vacated the arbitration award and awarded appellees attorney's fees without specifying an amount. It also ruled that the Austin property was appellees' homestead as of the time they entered the construction contract with Kendall and removed the liens. Kendall requested findings of fact and conclusions of law, which the trial court entered. Among these, the court found that the arbitrator's failure to disclose his stock losses in Vignette constituted "evident partiality" requiring the court to vacate the award and that appellees did not waive their right to object to the evident partiality of the arbitrator. The district court also found that $23,000 was a reasonable amount for the attorney's fee award. Kendall requested additional findings of fact and

conclusions of law, and the trial court entered additional findings of fact but declined to enter additional conclusions of law.[5] Kendall now appeals.

## DISCUSSION

**Standard of Review**

We attach to findings of fact the same weight, force, and dignity that we attach to a jury's verdict upon jury questions. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Lawyers Sur. Corp. v. Larson*, 869 S.W.2d 649, 653 (Tex. App.—Austin 1994, writ denied). Findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards used to review jury findings. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 195 (Tex. App.—Austin 1992, no writ).

In deciding a legal sufficiency challenge, "we must view the evidence in a light that tends to support the disputed finding and disregard evidence and inferences to the contrary." *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003) (citing *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001)). A legal sufficiency or "no evidence" point will be sustained when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706,

---

[5] Kendall does not complain of the trial court's refusal to enter additional conclusions.

711 (Tex. 1996); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d 706, 711 (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995).

When reviewing a challenge to the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence in the record. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g*, 835 S.W.2d at 196. We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We may not reverse merely because we conclude that the evidence preponderates toward a different answer. *See Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

A trial court's legal conclusions will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *See Westech Eng'g*, 835 S.W.2d at 196. Incorrect conclusions will not require a reversal if the controlling findings of fact will support a

7

correct legal theory. *See id.* Moreover, conclusions of law may not be reversed unless they are erroneous as a matter of law. *See id.*

**Arbitration issues**

Kendall asserts that the arbitrator was not evidently partial,[6] the testimony regarding shareholder hostility was inadmissible hearsay, and that, in any event, appellees waived their objection to the arbitrator's partiality. We agree that appellees waived their evident partiality complaint and need not reach Kendall's other grounds.

We initially note that Texas law favors the arbitration of disputes. *See CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 252 (Tex. 2002); *Brazoria County v. Knutson*, 176 S.W.2d 740, 743 (Tex. 1943) ("Arbitration is a proceeding so favored by Texas law that both our Constitution and statutes provide for the submission of differences to arbitration."). Arbitration is founded upon the consent of parties to forego their right to litigate disputes in our court system and instead submit them to a private decisionmaker. Texas law provides various protections to ensure that such consent is meaningfully obtained. Thus, while Texas courts rigorously enforce valid arbitration agreements, contractual defenses—such as fraud in the inception, mutual mistake, or unconscionability—can bar the enforcement of an arbitration agreement. *See In re Haliburton*, 80 S.W.3d 566, 572 (Tex. 2002); *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573 (Tex. 1999). Likewise, while trial courts have limited powers to invalidate arbitration awards, the Texas Arbitration Act requires them to

---

[6] Subsumed in this ground, Kendall urges that evident partiality is a question of law, not fact, and should be reviewed *de novo*.

vacate such an award if the rights of a party were prejudiced by "evident partiality by an arbitrator appointed as a neutral arbitrator." Tex. Civ. Prac. & Rem. Code Ann. § 171.088(2)(A) (West Supp. 2004). And where, as here, the parties are given the right to choose a neutral arbitrator to decide their dispute, the failure of a prospective arbitrator to provide parties with information bearing upon his or her partiality may itself constitute evident partiality. As the Texas Supreme Court has held:

> [A] prospective neutral arbitrator selected by the parties or their representatives exhibits evident partiality if he or she does not disclose facts which might, to an objective observer, create a reasonable impression of the arbitrator's partiality. We emphasize that this evident partiality is established from the *nondisclosure itself*, regardless of whether the nondisclosed information necessarily establishes partiality or bias.

*Burlington N. R. R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 636 (Tex. 1997) (emphasis in original) (citing *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 147 (1968)). The Texas Supreme Court also noted that full disclosure of such facts also serves the salutary goal of "allow[ing] the parties to evaluate any potential bias at the outset, rather than shifting the burden to the courts to do so when a dissatisfied party challenges an award." *Id.* (citing *Commonwealth Coatings*, 393 U.S. at 151).[7]

Implicit in *TUCO*'s full disclosure principle, as well as in the broader concept of arbitration as a consensual dispute resolution process, is that parties can agree to arbitrate a dispute, or continue arbitrating a dispute, despite the revelation of facts suggesting possible bias or partiality

---

[7] While acknowledging that a neutral arbitrator need not disclose relationships or connections that are "trivial," the supreme court admonished that "conscientious arbitrators should err in favor of disclosure." *Burlington N. R. R. Co. v. TUCO Inc.*, 960 S.W.2d 629, 637 (Tex. 1997).

9

by the arbitrator.[8] *Id.* at 637. In fact, as the supreme court suggested, capable arbitrators chosen on the basis of expertise and experience in a given industry will often have had *some* prior dealings with the parties that might be perceived as presenting a risk of partiality. *Id.* at 635. Rather than mandating a *per se* rule of disqualification in such situations, parties who have the right to choose arbitrators are instead allowed to use their own judgment to balance the competing interest of avoiding a risk of partiality with the interest in obtaining the arbitrator's expertise or other benefits of proceeding before the arbitrator. *Id.*

Consistent with these principles, a party can waive an otherwise valid objection to the partiality of the arbitrator by proceeding with arbitration despite knowledge of facts giving rise to such an objection. This is true even where an evident partiality objection could be asserted based on failure to disclose. *Mariner Fin. Group, Inc. v. H.G. Bossley*, 79 S.W.3d 30, 36 (Tex. 2002) (Owen, J., concurring) ("[t]here could be waiver of evident partiality based on nondisclosure if the complaining party knew all the facts before the arbitration concluded and did not complain").

Waiver is "[the] intentional relinquishment of a known right or intentional conduct inconsistent with claiming it." *In re Media Arts Group, Inc.*, 116 S.W.3d 900, 909 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Here, it is undisputed that both Cullen and Chesson had actual knowledge that the arbitrator suffered investment losses in Vignette stock—the basis for their evident partiality complaint—approximately one month before the arbitration award was issued. The arbitrator divulged this information directly to Cullen during the arbitration hearings. "[A] couple

---

[8] The *TUCO* court contemplated that such facts might come to light during the arbitration. *Id.*

10

of days later," as he put it, Cullen informed Chesson of this disclosure. Appellees nonetheless proceeded with the arbitration without objection, awaiting the award that was eventually issued. Only after the award turned out to be adverse to them did either Cullen or Chesson raise an objection regarding the arbitrator's partiality or even bother to raise the issue with their attorney.

To minimize the significance of their knowledge of the arbitrator's stock losses, appellees rely on three contentions. First, they urge that the arbitrator did not divulge sufficient information for appellees to have knowingly and intentionally relinquished anything. We disagree because the information divulged by the arbitrator was sufficient to place them on notice of the facts giving rise to what they now contend is a reasonable possibility of partiality. *See Cook Indus. v. C. Itoh & Co.*, 449 F.2d 106, 108 (2nd Cir. 1971) ("When a party has knowledge of facts *possibly indicating bias or partiality* on the part of the arbitrator he cannot remain silent and later object to the award of the arbitrator on that ground.") (emphasis added). In fact, disclosure of further details regarding the arbitrator's losses in Vignette—which appellees later discovered constituted less than one percent of the arbitrator's net worth—would actually have tended to minimize the perceived significance of the losses. Before appellees researched the extent of the arbitrator's losses in Vignette, all that was known was the more ominous spectre that the arbitrator had lost some unspecified amount.

Second, appellees emphasize that the arbitrator mentioned his stock losses only to Cullen, who was not familiar with the AAA rules. The district court found that "Cullen did not and—because he was not familiar with the AAA Rules and procedures to be followed in Arbitration Proceedings—could not understand and appreciate the significance of the Arbitrator's comments."

11

However, it is undisputed that Cullen recounted his exchange with the arbitrator to Chesson shortly after the hearing. Chesson undisputably received communications directly from the AAA informing her where to find the AAA rules; she also participated in the selection of the arbitrator. For this reason, we conclude that Chesson had at least constructive notice of her rights. We cannot reward parties for not reading legal documents that affect them and then using their ignorance as a tool to undermine the proceedings.[9]

Third, appellees emphasize that their lawyer did not know about the exchange between Cullen and the arbitrator until after the award was announced. We reject appellees' suggestion that their lawyer's lack of knowledge of grounds for an evident partiality objection excuses conduct otherwise constituting waiver of that objection. Although no Texas cases appear to have addressed appellees' precise contention,[10] Texas cases addressing evident partiality and

---

[9] *Cf. Estes v. Republic Nat'l Bank*, 462 S.W.2d 273, 276 (Tex. 1970) (absent fraud, failure to read contract generally is not ground to avoid it).

[10] Appellees point to a case from our sister court in Corpus Christi to support their contention that their lawyer had to have knowledge of the potential bias in order for them to have properly waived the objection. *See Morin v. Boecker*, 122 S.W.3d 911 (Tex. App.—Corpus Christi 2003, no pet.). This case is distinguishable. In *Morin*, the party had received a document from the court notifying him of court costs that had to be paid in order to perfect his appeal. *Id.* The court costs were never paid and his appeal was dismissed. *Id.* The Corpus Christi court held, however, "that when a party is represented by counsel who has made an appearance, Rules 8 and 21a require that all communications be sent to the party's attorney." *Id.* at 914. The holding of *Morin* is based in part on the fact that it was reasonable for the party to assume that the court had sent a copy of the notice to his lawyer: "Most likely, a party will not understand the importance of getting the information to his attorney promptly or will expect that his attorney received notice directly." *Id.* Here, under the facts of our case, the only way that their lawyer could have known about the arbitrator's potential bias is for Cullen or Chesson to have informed him. Once appellees knew about the potential bias it became their burden to object or risk waiving their objection.

12

waiver issues contemplate disclosure of relevant facts to a *party*, with no mention of lawyers. *See, e.g.*, *Bossley*, 79 S.W.3d at 32 ("from the summary judgment evidence, we know that the Bossleys did not learn about the relationship between Asmar and Nettles until after the arbitration"); *TUCO*, 960 S.W.2d at 635-39. As our sister court in Houston stated:

> A party who does not object to the selection of the arbitrator or to any alleged bias on the part of the arbitrator at the time of the hearing waives the right to complain. A party may not sit idly by during an arbitration procedure and then collaterally attack that procedure on grounds not raised before the arbitrator when the result turns out to be adverse. Implicit in this rule, however, is the idea that a *party* knows or has reason to know of an arbitrator's bias but remains silent pending the outcome of the arbitration.

*Mariner Fin. Group, Inc. v. H.G. Bossley*, 11 S.W.3d 349, 351-52 (Tex. App.—Houston [1st Dist.] 2000), *aff'd*, 79 S.W.3d 30, 32 (Tex. 2002) (internal citations omitted) (emphasis added); *see also TUCO*, 960 S.W.2d at 637 n.9 ("Of course, a party who learns of a conflict before the arbitrator issues his or her decision must promptly object to avoid waiving the complaint."). This appears to be the rule in other jurisdictions, as well.[11]

This focus on disclosure to parties, as opposed to their lawyers, is consistent with *TUCO*'s vision of arbitration as a procedure whereby *parties* must evaluate for themselves whether

---

[11] *See Daichi Hawaii Real Estate Corp. v. Lichter*, 82 P.2d 411, 431-32 (Haw. 2003) (court found waiver of evident partiality objection because party had letter in its files prior to arbitration evidencing arbitrator's past dealings with opposing party); *Kubarych v. Siegel*, 595 N.Y.S.2d 293, 294 (N.Y. Sup. Ct. 1993) (party waived evident partiality objection when he did not object after arbitrator coerced sports tickets from him); *Jean A. McCoy & Sons, Inc. v. La Salle County*, 363 N.E.2d 442, 443 (Ill. App. 1977) (party waived evident partiality objection when officer of party discovered arbitrator having drinks with opposing party's representative but did not object until after unfavorable award).

to proceed with submitting their dispute before a particular decisionmaker. Having elected to proceed with arbitration in the face of their knowledge of the arbitrator's losses in Vignette stock, appellees cannot now complain of the outcome. *See TUCO*, 960 S.W.2d at 635-36 (expressing preference for "allow[ing] the parties to evaluate any potential bias at the outset, rather than shifting the burden to the courts to do so when a dissatisfied party challenges an award") (citing *Commonwealth Coatings*, 393 U.S. at 151). We overrule the district court's vacation of the arbitrator's decision and sustain Kendall's first issue.

**Homestead issues**

Kendall's second issue challenges the district court's ruling that appellees' Austin property was their homestead so as to invalidate Kendall's liens. We begin our discussion of this issue by noting that the Texas Constitution provides special and unique protections for the homestead, separate and distinct from the protections given other types of property. Tex. Const. art. XVI, § 50. The homestead interest is a legal interest created by the constitution that provides prophylactic protection from all but the few specifically enumerated types of constitutionally permitted liens against homesteads. *Heggen v. Pemelton*, 836 S.W.2d 145, 148 (Tex. 1992). Constitutional homestead rights protect citizens from losing their homes; accordingly, statutes relating to homestead rights are to be liberally construed to protect the homestead. *Rooms With a View, Inc. v. Private Nat'l Mortgage Ass'n, Inc.*, 7 S.W.3d 840, 849 (Tex. App.—Austin 1999, pet. denied). Homestead rights have historically enjoyed great protection in our jurisprudence. *Mills v. Von Boskirk*, 32 Tex. 360, 362 (1869).

14

Homesteads are generally protected from forced sale for the payment of debts, except for those debts specifically enumerated in the constitution, which include debts incurred for purchase money on the homestead, for taxes owed thereon, and for work or services performed thereon. Tex. Const. art. XVI, § 50(a)(1), (2), (5). Because the homestead protection does not extend to debts incurred for improvements made to the homestead, laborers may secure valid mechanic's and materialman's liens against the homestead on which the work was performed, but only by following certain constitutional and statutory procedures. *Id.* § 50(a)(5); Tex. Prop. Code Ann. § 53.254 (West Supp. 2004). Contractors like Kendall making improvements on a homestead must comply with the requirements found in section 53.254 of the property code in order to attach a valid lien. Tex. Prop. Code Ann. § 53.254. Only upon satisfaction of those requirements may a contractor attempt to force the sale of a homestead by judicial foreclosure. *Id.* § 53.154 (West 1995).[12]

It is undisputed that Kendall did not follow those procedures here. Instead, Kendall contends that its liens were valid because appellees' Austin property was not homestead property. Kendall has stipulated that appellees intended to use the Austin property as their homestead once the

---

[12] To fix a lien on a homestead, the property code requires that (1) the person who is to furnish material or perform labor and the owner must execute a written contract setting forth the terms of the agreement; (2) the contract must be executed prior to the furnishing of materials or the performance of labor; (3) if the owner is married, the contract must be signed by both spouses; (4) if the contract is made by an original contractor, the contract must inure to the benefit of all persons who perform labor or furnish materials for the original contractor; and (5) the contract must be filed with the county clerk of the county in which the homestead is located. Tex. Prop. Code Ann. § 53.254 (West Supp. 2004). The Texas Constitution also has requirements for attaching a lien on a homestead; however, as for the requirements pertinent to this case, the property code includes the constitution's requirements. *See* Tex. Const. art. XVI, § 50 ("in writing, with the consent of both spouses, in the case of a family homestead, given in the same manner as is required in making a sale and conveyance of the homestead").

remodeling was completed. However, Kendall maintains that at the time appellees entered into the construction contract with Kendall—the time that controls the validity of its liens—the Austin property was not yet appellees' legal homestead because, as a matter of law, they had not abandoned their California property.

A family is not entitled to two homesteads at the same time. Tex. Const., art. XVI, § 51; *Achilles v. Willis*, 16 S.W. 746 (Tex. 1891). As the district court recognized in its conclusions of law, "Texas has long recognized that the acquisition of a new homestead is an abandonment of the old homestead *as a matter of law*." *Id.* (citing *Silvers v. Welch*, 91 S.W.2d 686, 687-88 (Tex. 1936)) (emphasis in original). In the *Silvers* case, the Texas Supreme Court faced a similar factual and procedural situation as we do in this case. The Silvers had lived and farmed on one tract of land—their homestead—for many years, but then they bought another tract of land and moved onto it. *Silvers*, 91 S.W.2d at 686-87. They did not sell the first tract of land and some of their children and some of their property remained there. *Id.* at 687. The court was called upon to determine whether the lower courts had erred in deciding which of two properties was a homestead. The court concluded:

> When the Silvers established their new homestead, they abandoned the old one as a matter of law. It is well recognized that abandonment is largely a question of intention, and that the mere fact of acquiring and moving upon another piece of property does not conclude the question of abandonment; but here we have a finding of the establishment of a homestead on the newly acquired tract. That finding is a definite and conclusive determination that the first homestead was abandoned.

*Id.* at 687-88.

16

Thus, the controlling issue is not whether appellees undertook a series of acts to formally abandon their California homestead, but only whether the evidence is legally and factually sufficient to support the district court's finding that the Austin property had become appellees' homestead by the time they entered into the construction contract with Kendall. *See Norman v. First Bank & Trust, Bryan*, 557 S.W.2d 797, 802 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e) (citing *Silvers*, 91 S.W.2d at 686). We conclude that the evidence is legally and factually sufficient to support that finding.

"Absent actual occupancy or intent to occupy coupled with overt acts of preparation evidencing that intention, no homestead right attaches." *Silvers*, 91 S.W.2d at 688. It is essential that there be an existing bona fide intention to dedicate the property as a homestead, and the intent must be accompanied by such acts of preparation and such prompt subsequent occupation as will amount to notice of the dedication. *Simank v. Alford*, 441 S.W.2d 234, 237 (Tex. App.—Austin 1969, writ ref'd n.r.e) (citing Gardner *v. Douglass*, 64 Tex. 76 (1885)). Here, before hiring Kendall, appellees hired an interior decorator to assist in preparing the home for appellees' family to occupy. Furthermore, appellees also offered evidence that they registered to vote (and voted) in Austin, obtained Texas driver's licenses, had their car shipped to Austin and registered it in Texas, opened a joint checking account in Austin for which they listed the Austin property as their home address, and made donations to Austin charities. Kendall does not dispute that such acts provide sufficient indicia of the requisite intent to establish appellees' Austin property as their homestead.

Furthermore, the Texas Supreme Court has suggested that fewer acts of preparation may be necessary to establish a homestead where, as here, there is evidence that the contractor had

17

actual knowledge of a property owner's intent to use the property as a homestead. In *Cameron v. Gebhard*, the supreme court stated that "[p]reparation—that is, such acts as manifest this intention—is but the corroborating witness to the declaration of intention, the safeguards against fraud, and an assurance of the bona fides of the declared intention of the party." 22 S.W. 1033, 1033 (Tex. 1893). In *Cameron*, the plaintiff lumber company had been expressly told by the property owner that she intended to use the property as her homestead. *Id.* at 1033. The court held that proof only that she had hired a contractor to build a house and told the lumber company that the property owner intended to use the home as her homestead was enough to establish the property as her homestead. *Id.*

In the present case, Chesson and the interior decorator, who had recommended Kendall for the remodeling work, both testified that Chesson informed Kendall, before they entered into the remodeling contract, that the Austin property was to be the permanent home of Chesson, her husband, and their family. Although a representative from Kendall testified that this information was not relayed to Kendall, ultimately it is the purview of the trial court to make credibility determinations between conflicting witnesses. *See Raymond v. Rahme & Williams Invs.*, 78 S.W.3d 552, 555-56 (Tex. App.—Austin 2002, no pet.).

In conducting a legal sufficiency review, we must determine whether more than a scintilla of evidence exists supporting the trial court's finding thus that, as a whole, the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711. Under a factual sufficiency review, we should set aside the verdict only if the evidence that supports the finding is so weak as to be clearly wrong and manifestly unjust. *See*

18

*Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We find the evidence legally and factually sufficient to support the trial court's judgment. We overrule Kendall's second issue.

**Attorney's fees**

Kendall asserts in its third issue that the district court erred in awarding appellees attorney's fees because there is no evidence to support such an award. We agree. Appellees did not introduce evidence of their attorney's fees, but merely asked the district court to take judicial notice of the reasonableness and necessity of attorney's fees. On this basis alone, the district court made a finding of fact that $23,000 was a reasonable amount for appellees' attorney's fees.

A court may take judicial notice of usual and customary attorney's fees by statute in certain specific instances. *See* Tex. Prac. & Rem Code Ann. § 38.004 (West 1997). However, it has been expressly held that this provision only applies to actions seeking an award of statutory attorney's fees pursuant to that chapter. *Coward v. Gateway Nat'l Bank of Beaumont*, 525 S.W.2d 857, 858-59 (Tex. 1975) (applying predecessor to chapter 38). Neither party asserts that this case falls within any of the enumerated categories of chapter 38. Because there is no evidence in the record to support the district court's attorney's fee award, we sustain Kendall's third issue and reverse the award of attorney's fees.

**CONCLUSION**

We hold that the district court erred in vacating the arbitration award; therefore, we reverse that part of the district court's judgment and render judgment that the arbitration award be reinstated. We affirm the district court's ruling invalidating Kendall's liens because appellees'

19

Austin home was their homestead.  We reverse the district court's ruling awarding attorney's fees to appellees.

_____

Bob Pemberton, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed in Part; Reversed and Rendered in Part

Filed:   June 24, 2004