**Ronald PUGH and Betty Pugh, Appellants,**

v.

**GENERAL TERRAZZO SUPPLIES, INC., Appellee.**

**No. 01–06–00449–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

July 12, 2007.

Rehearing Overruled Dec. 12, 2007.

Bradford W. Irelan, Irelan & Hargis, P.L.L.C., Robert Alan York, Misty Annette Hataway–Cone', Godwin Pappas Langley Ronquillo, LLP, Houston, TX, for Appellants.

George E. Crumley, Stradley & Wright, Dallas, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

## OPINION

TERRY JENNINGS, Justice.

Appellants, Ronald and Betty Pugh, challenge the trial court's rendition of summary judgment in favor of appellee, General Terrazzo Supplies, Inc. ("General Terrazzo"), in their suit against General Terrazzo for damage to their home arising out of the use of an exterior insulated finishing system ("EIFS") to their home. In three issues, the Pughs contend that the trial court erred in granting General Terrazzo's summary judgment motion on the grounds that "the statute of limitations or lack of notice barred [their] breach of implied warranty claims" and the economic loss doctrine barred their negligence and strict liability claims. The Pughs further contend that General Terrazzo owed "a duty as a manufacturer and/or supplier of EIFS to supply a safe product."

We affirm.

## Factual and Procedural Background

In their seventh amended petition, the Pughs alleged that they contracted with Westbrook Building Company ("Westbrook") to build their home.[1] Rudy Guajardo, doing business as RBS Masonry, Inc. ("RBS"), applied the EIFS veneer on their home, and General Terrazzo "supplied and manufactured the essential materials to RBS, instructed RBS on the application process, and inspected the work." The Pughs complained that the EIFS was "improperly applied" by RBS, causing decay and compromising the integrity of the wood framing in the home's structural columns. They asserted that, "due to poor workmanship," there were visible gaps where the down spouts penetrated the columns, the columns lacked ways to vent moisture, there was inadequate sealing and flashing around the doors and windows, there was a lack of drainage and venting capability in the wall cavity, and, contrary to industry standards, there was no "backer rod" used in the EIFS system. "[D]ue to negligent application," moisture penetrated the EIFS system and caused continuous damage from the date of the home's completion. The Pughs discovered the damage to their home in May 2001, when the damage "permeated the exterior coating" and the EIFS system was removed, exposing the decayed wood fram-

---

1. In their petition, the Pughs stated that "[p]ursuant to a contract of insurance issued by Chubb Insurance Company to [them], Chubb Insurance obtained its rights to pursue recovery of amounts [it] paid to its insured in the name of the insured." Thus, in this case, "Chubb Insurance Company is the real party in interest."

ing, water damage, and mold. The moisture also caused, among other things, warping in their hardwood flooring.

The Pughs sued General Terrazzo for negligence, "products liability (marketing defect)," and breach of the "implied warranties of good and workmanlike service and habitability."[2] In their negligence claim, the Pughs asserted that General Terrazzo "breached its duties" by "supplying an EIFS system that was incompatible with architectural plans" and by failing to "properly supervise the application," "properly instruct or train applicators," "properly manufacture the EIFS system," "provide proper instructions and warnings for applying the EIFS," "properly inspect the completed application," and "instruct the Pughs as to the proper long term maintenance of the EIFS system to avoid water penetration." In their products liability claim, the Pughs asserted that General Terrazzo "knew or should have known of a potential risk of harm presented by the EIFS," but marketed EIFS without adequate warnings or instructions. In their implied warranty claims, the Pughs asserted that General Terrazzo "participated in the construction of the home," "the construction of the EIFS system was not performed in a good and workmanlike manner," and General Terrazzo "created a defect in the home through defective construction methods in the application of the EIFS system."

On July 15, 2005, General Terrazzo filed a summary judgment motion, contending that the Pughs' warranty claims are barred by the statute of limitations and their failure to give the statutorily required notice. General Terrazzo further contended that the Pughs' claims for negligence and strict liability are barred by the economic loss doctrine. In their response, the Pughs asserted that the discovery rule is applicable and that the statutory notice requirements are not applicable. The Pughs also argued that the economic loss doctrine does not bar their negligence claims because they are not seeking "damages for loss of the product provided by General Terrazzo alone" and General Terrazzo's duties are "outside the scope of its contract to provide product." The Pughs cited deposition testimony from Guajardo, the applicator, wherein he stated that he purchased the materials he used to install the EIFS system from General Terrazzo; General Terrazzo provided brochures and told him "how to do it" and "how to mix it"; he would have gone to General Terrazzo for instruction and guidance if he had problems with installing the EIFS; and General Terrazzo sent a representative to make sure he "did it right."

In its supplemental motion, in response to the Pughs' amended common law implied warranty claims, General Terrazzo asserted that there is no legal basis to support such claims "against a materials supplier" or a "subcontractor." General Terrazzo reiterated that the Pughs' tort claims are barred by the economic loss doctrine and further contended that it did not owe a duty to the Pughs. General Terrazzo also included in its supplemental motion a "no evidence motion for summary judgment," arguing that the Pughs' negligence claim fails because there is no evidence of the existence or breach of any

---

2. The Pughs also asserted claims against Westbrook and RBS, neither of whom are parties to this appeal. The Pughs asserted that Westbrook breached its contract by failing "to build the home in a manner consistent with the promises made both express and implied." The Pughs did not allege and did not present any evidence that they had a contractual relationship with any of the other defendants, including General Terrazzo, or that they had any direct dealings or contacts with General Terrazzo. The Pughs dismissed their claims against RBS and obtained a default judgment against Westbrook.

duty and the Pughs' warranty claims fail as there is no evidence of the existence or breach of any implied warranty.[3]

■ In their response to the supplemental summary judgment motion, the Pughs argued that, because General Terrazzo voluntarily expanded its role beyond a mere supplier when it provided RBS with instructions on the application of the EIFS system, it created a duty to exercise reasonable care that the Pughs' property would not be damaged. The Pughs again cited testimony from Guajardo that General Terrazzo trained him on "how to use it and how to mix it" and "how to put it on the wall." [4] The Pughs also asserted that the implied warranties of good workmanship and habitability could be extended to apply to subcontractors, and as such, should apply to General Terrazzo.

In its reply, General Terrazzo cited deposition testimony from Guajardo in which he stated that he answered to the general contractor, Westbrook, during the construction of the Pughs' home. General Terrazzo also cited Guajardo's testimony that he knew how to apply the EIFS system, did not need General Terrazzo to tell him how to apply the EIFS system, and the General Terrazzo representative who visited the job site did not provide him with instructions. General Terrazzo emphasized that neither RBS nor the Pughs owed any duties to each other, so that any attempt to impose liability on General Terrazzo would require permitting the Pughs to reach over both RBS, the subcontractor, and Westbrook, the general contractor. General Terrazzo also noted that there was no allegation or evidence that RBS "was obligated to follow the supervision or control of General Terrazzo ... or that General Terrazzo was obligated to be responsible for RBS's actions."

The trial court granted General Terrazzo's summary judgment motion, denying the Pughs' claims against General

---

3. In support of its contention that it did not have any direct dealings with the Pughs, General Terrazzo cites Ronald Pugh's deposition testimony that he had no dealings with General Terrazzo and Wallace Westbrook's deposition testimony that he did not have a contract with General Terrazzo in the construction of the Pughs' home. Thus, the record indicates that RBS was the only party in the underlying case to have any contacts with General Terrazzo.

4. As of July 15, 2005, the date General Terrazzo filed its original motion, the Pughs had filed their Fifth Amended Petition. The Pughs responded to General Terrazzo's summary judgment motion on September 2, 2005, by filing both a response and a Seventh Amended Petition. On September 14, 2005, General Terrazzo filed "its supplemental motion for summary judgment," stating that it was filing the motion, pursuant to the court's instruction at a September 9, 2005 summary judgment hearing, "as a supplement" to its previous summary judgment motion in order "to address specific changes in [the Pughs' pleadings] and legal issues raised at the time of [the original summary judgment hearing] on Sep-

tember 9, 2005." The Pughs filed a response to the supplemental summary judgment motion on September 30, 2005, and General Terrazzo filed a reply on October 6, 2005. On October 7, 2005, the trial court heard and signed an order granting General Terrazzo's summary judgment motion, denying the Pughs' claims against General Terrazzo "in their entirety." Although the order does not specifically state the basis on which the trial court granted summary judgment and does not expressly reference either the original or the supplemental motion and responses, the record makes clear that, at the time it signed its order, the trial court had before it and considered the original and supplemental motions, responses, and evidence on file. Thus, contrary to the Pughs' contention, we may consider and affirm the summary judgment on the grounds stated in the original and supplemental motions. *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 173 (Tex.1995); *Summers v. Fort Crockett Hotel, Ltd.*, 902 S.W.2d 20, 25 (Tex.App.-Houston [1st Dist.] 1995, writ denied).

Terrazzo "in their entirety" and rendering judgment that the Pughs take nothing in regard to their claims against General Terrazzo.

### Standard of Review

To prevail on a summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of material fact. TEX.R. CIV. P. 166a(c); *Cathey v. Booth,* 900 S.W.2d 339, 341 (Tex. 1995). We may affirm a summary judgment only when the record shows that a movant has disproved at least one element of each of the plaintiff's claims or has established all of the elements of an affirmative defense as to each claim. *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997). When, as in this case, a summary judgment does not specify the grounds on which the trial court granted it, the reviewing court will affirm the judgment if any theory included in the motion is meritorious. *Harwell v. State Farm Mut. Auto. Ins. Co.,* 896 S.W.2d 170, 173 (Tex.1995); *Summers v. Fort Crockett Hotel, Ltd.,* 902 S.W.2d 20, 25 (Tex.App.-Houston [1st Dist.] 1995, writ denied). However, a summary judgment must stand or fall on the grounds expressly presented in the motion. *McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 339–41 (Tex.1993).

### Implied Warranty Claims

■ In their first issue, the Pughs argue that the trial court erred in granting General Terrazzo's summary judgment motion because General Terrazzo failed to establish, as a matter of law, that "the statute of limitations or lack of notice barred [their] breach of implied warranty claims [of good and workmanlike service and habitability]." General Terrazzo does not address the issues of notice or limitations in its appellate briefing. Rather, General Terrazzo responds to the Pughs' first issue by arguing that the Pughs' implied warranty claims are barred because Texas does not recognize the existence of any implied warranties of good and workmanlike service and habitability from a materials supplier or a subcontractor to a homeowner with whom it has no direct relationship.

■ The Pughs supply no authority supporting their assertion that a materials supplier, like General Terrazzo, whose materials are incorporated into the building of a home, may be liable to a homeowner under a claim for the breach of implied warranties "of good and workmanlike service and habitability."[5] To the extent that the Pughs are asserting that General Terrazzo acted in some capacity as a subcontractor during the construction of their home, Texas courts have consistently held that a property owner may not recover under an implied warranty theory from a subcontractor with whom the owner had no direct contractual relationship. *See J.M. Krupar Const. Co., Inc. v. Rosenberg,* 95 S.W.3d 322, 332 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (holding homeowner did not have cause of action for common law breach of implied warranty against subcontractor who performed foundation

---

**5.** The Pughs cite *Thomas v. Atlas Foundation Company, Inc.,* in which the court suggested that an implied warranty of good-and-workmanlike performance existed between a subcontractor and a homeowner. 609 S.W.2d 302, 303 (Tex.Civ.App.-Fort Worth 1980, writ ref'd n.r.e.). However, as the Austin Court of Appeals noted in *Codner v. Arellano,* the *Thomas* court's discussion of the implied warranty was dicta because the subcontractor in that case did not appeal the finding of liability and the issue of the subcontractor's liability to the homeowners was not at issue in the appeal. 40 S.W.3d 666, 673 n. 4 (Tex.App.-Austin 2001, no pet.) (citing *Thomas,* 609 S.W.2d at 303).

work on home and stating that home-owner's remedy for damages resulting from faulty construction was against general contractor); *Rayon v. Energy Specialties, Inc.*, 121 S.W.3d 7, 21 (Tex.App.-Fort Worth 2002, no pet.) (holding plaintiff's implied warranty claim against a subcontractor was barred as a matter of law); *Raymond v. Rahme*, 78 S.W.3d 552, 563 (Tex.App.-Austin 2002, no pet.) (noting that, because property owner has recourse against general contractor with whom he contracted, "there is no compelling public policy reason to impose an implied warranty against a subcontractor," and holding evidence legally insufficient to support a finding of implied warranty of good and workmanlike conduct between subcontractor and property owner); *Codner v. Arellano*, 40 S.W.3d 666, 672–74 (Tex.App.-Austin 2001, no pet.) ("declin[ing] to apply, as a matter of public policy, an implied warranty … between a homeowner and a subcontractor").

Accordingly, we hold that the trial court did not err in granting General Terrazzo's summary judgment motion on the Pughs' claims for breach of implied warranties of good and workmanlike service and habitability.

We overrule the Pughs' first issue.[6]

**Negligence and Strict Liability Claims**

■ In their second and third issues, the Pughs argue that the trial court erred in granting General Terrazzo's summary judgment motion because General Terrazzo failed to establish, as a matter of law,

that the economic loss doctrine barred their negligence and strict liability claims. The Pughs further contend in these issues that General Terrazzo owed "a duty as a manufacturer and/or supplier of EIFS to supply a safe product."

■ The economic loss doctrine applies to both negligence and strict liability claims. *Murray v. Ford Motor Co.*, 97 S.W.3d 888, 891 (Tex.App.-Dallas 2003, no pet.); *see also Trans–Gulf Corp. v. Performance Aircraft Servs., Inc.*, 82 S.W.3d 691, 695 (Tex.App.-Eastland 2002, no pet.) ("Simply stated, a duty in tort does not lie under the economic loss rule when the only injury claimed is one for economic damages."). The economic loss rule applies when losses from an occurrence arise from failure of a product and the damage or loss is limited to the product itself. *Equistar Chems., L.P. v. Dresser–Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007). "The rule does not preclude tort recovery if a defective product causes physical harm to the ultimate user or consumer or other property of the user or consumer in addition to causing damage to the product itself." *Id.*

The doctrine has been expressed and applied by Texas courts in two related, overlapping contexts. *See Coastal Conduit & Ditching, Inc. v. Noram Energy Corp.*, 29 S.W.3d 282, 285 (Tex. App.-Houston [14th Dist.] 2000, no pet.). First, the doctrine has been applied to preclude tort claims brought to recover economic losses when those losses are the subject matter of a contract.[7] *Id.; see also Jim*

---

6. In light of our holding, we need not address the Pughs' specific contentions regarding limitations or notice.

7. General Terrazzo notes that the Texas Supreme Court has already dealt with the economic loss rule in the context of allegations of defective home construction. *See Jim Walter Homes v. Reed*, 711 S.W.2d 617, 618 (Tex.

1986). In *Jim Walter Homes*, the purchasers of a home sued the homebuilder for breach of warranty of good workmanship in the contract and gross negligence in supervising the construction of the home. *Id.* at 617. Concluding that the purchaser's injury was "that the house they were promised and paid for was not the house they received," the court determined that the action could only be

*Walter Homes v. Reed,* 711 S.W.2d 617, 618 (Tex.1986) ("When the injury is only the economic loss to the subject of the contract itself, the action sounds in contract alone"); *Coffey v. Fort Wayne Pools, Inc.,* 24 F.Supp.2d 671, 687 (N.D.Tex.1998) ("It is well-settled Texas law that a plaintiff cannot maintain a tort action against a defendant when his damages are only for economic losses caused by the failure to perform a contract.").

Second, the economic loss doctrine has been applied to preclude tort claims brought to recover economic losses against the manufacturer or seller of a defective product where the defect damages only the product and does not cause "personal injury" or damage to "other property." *Coastal Conduit & Ditching, Inc.,* 29 S.W.3d at 285–86; *see also Mid Continent Aircraft Corp. v. Curry County Spraying Serv., Inc.,* 572 S.W.2d 308, 312–13 (Tex.1978) (stating that, in transactions between commercial seller and commercial buyer, when no physical injury has occurred to persons or "other property," injury to defective product itself is an economic loss governed by the Uniform Commercial Code); *see also Equistar Chems., L.P. v. Dresser–Rand Co.,* 123 S.W.3d 584, 587 (Tex.App.-Houston [14th Dist.] 2003), *overruled on other grounds,* 240 S.W.3d 864 (Tex.2007) ("In transactions between commercial buyers and sellers, if damage occurs only to the product that passed between them, the claim is one for economic loss and must be brought on the parties' contract; conversely, if there is physical injury to persons or 'other property' (that is, property other than the product itself), those claims may

be brought in tort."); *Murray,* 97 S.W.3d at 891 ("Where a product injures a consumer economically and not physically, the consumer may recover under the warranties provided by the Uniform Commercial Code, but not for strict liability in tort." (citations omitted)).

In regard to the application of the economic loss doctrine to losses that are the subject matter of a contract, the doctrine has been applied to preclude tort claims between parties who are not in privity. *See, e.g., Trans–Gulf Corp.,* 82 S.W.3d at 694–95; *Coastal Conduit & Ditching, Inc.,* 29 S.W.3d at 285–90; *Hou–Tex, Inc. v. Landmark Graphics,* 26 S.W.3d 103, 106–07 (Tex.App.-Houston [14th Dist.] 2000, no pet.); *Hininger v. Case Corp.,* 23 F.3d 124, 126–27 (5th Cir.1994). For example, in *Trans–Gulf Corp.,* the purchaser of an airplane brought claims against a contractor who had been hired by the airplane's seller, as well as a subcontractor hired by that contractor, to perform repair work. 82 S.W.3d at 693. The purchaser alleged that the contractors, with whom the purchaser had no contractual relationship, used improper sealant, and asserted negligence claims against them. *Id.* The court held that the purchaser's tort claims for economic losses against these "contractual strangers" were barred by the economic loss doctrine. *Id.* at 695.

Similarly, in *Hou–Tex, Inc.,* an oil and gas company contracted with a geological contractor to assist it in choosing a drilling site. 26 S.W.3d at 106–07. The contractor used defective computer software, resulting in the drilling of a dry well. *Id.* at 107.

characterized as one for breach of contract and would not support an award of exemplary damages. *Id.* at 618. Although *Jim Walter Homes* is instructive on the basic principles of the economic loss doctrine, this case is distinguishable in that General Terrazzo, the party seeking the application of the economic loss

doctrine, is not the homebuilder with whom the Pughs contracted to build the house. As we explain further below, however, the economic loss doctrine does not apply only to bar claims against those in a direct contractual relationship.

The oil and gas company sought to recover its economic losses against the software developer, with whom it had no contractual relationship, under a negligence theory. *Id.* The court, rejecting the argument that the software developer owed the oil and gas company a duty in tort, held that the economic loss doctrine precluded the oil and gas company's negligence claims against the software developer. *Id.*

In regard to application of the economic loss doctrine to losses arising out of a defective product when there is no occurrence of "personal injury" or damage to "other property," Texas courts have rejected the argument that damage to a finished product caused by a defective component part constitutes damage to "other property," so as to permit tort recovery for damage to the finished product. *See Murray,* 97 S.W.3d at 891. For example, in *Murray,* the owners of a Ford truck brought products liability and negligence claims against Ford after an electrical failure in a wiring harness caused the truck to catch fire. *Id.* at 890. The court held that the economic loss doctrine barred the owners' tort claims for damage to the truck, concluding instead that such claims would properly be brought as warranty claims.[8] *Id.* at 891–92; *see also Mid Continent Aircraft Corp.,* 572 S.W.2d at 312–13 (suggesting that entire aircraft was defective product and not "other property" damaged by a defective engine or component part).

Consistent with the principles set forth in *Murray* and *Mid Continent Aircraft Corp.,* the economic loss doctrine has been further applied to preclude tort claims for economic losses made directly against a manufacturer or supplier of a defective component part that causes damage to the "finished product" into which the component is incorporated. *See Am. Eagle Ins. Co. v. United Techs. Corp.,* 48 F.3d 142, 145 (5th Cir.1995); *Hininger,* 23 F.3d at 127. In *American Eagle Insurance Company,* an airplane owner brought negligence claims against the manufacturer of a defective engine that caused the airplane to crash, resulting in damage to the hull. 48 F.3d at 144. Noting that "Texas does not permit recovery under a negligence theory for economic loss resulting from damage to a defective product" and further noting that the airplane owner did not bargain separately for the engine and that the engine was installed prior to the owner's purchase, the court held that the aircraft hull, the product into which the engine had been incorporated, did not constitute "other property." *Id.* at 144–45. Applying the economic loss doctrine, the court affirmed the summary judgment on the owner's negligence and strict products liability claim against the engine manufacturer. *Id.* at 145.

Likewise, in *Hininger,* the purchaser of a combine brought a negligence and products liability action against the manufacturer of the combine wheel that had been incorporated into the combine, seeking to recover economic losses caused by the wheel's failure. 23 F.3d at 125. Specifically, the purchaser sought to recover from the manufacturer of the combine wheels its damages for lost profits and repair costs. *Id.* Concluding that the purchaser's claims were barred by the economic loss doctrine, the court stated, "it is clear to us that most of the reasoning that led the Texas Supreme Court to reject an action in tort against a manufacturer of a finished

---

8. The court remanded the owners' tort claims for damage to their personal property that was inside the truck at the time of the fire, noting that even Ford conceded that the economic loss doctrine would not apply to the owners' tort claims for the loss of this personal "other property." *Murray v. Ford Motor Co.,* 97 S.W.3d 888, 893 (Tex.App.-Dallas 2003, no pet.).

product for economic loss supports the denial of a similar action against a component supplier." *Id.* at 127; *see also King v. Hilton–Davis*, 855 F.2d 1047, 1051 (3d Cir.1988) ("We perceive no principled basis for affording the purchaser of a defective product greater relief against the manufacturer of a component part that has rendered a product defective than against the manufacturer of the assembled defective product"); *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 930 (5th Cir.1987) (applying economic loss rule and stating that product means finished product bargained for by purchaser).

Although, as the Pughs note, "no court in this state has examined whether the economic loss doctrine would preclude recovery for 'other property damage' resulting from the use of EIFS in residential or commercial construction," they urge us to apply the definition of "property damage" used by our sister court in *Lennar Corporation v. Great American Insurance*, 200 S.W.3d 651, 677 (Tex.App.-Houston [14th Dist.] 2006, pet. filed). In *Lennar*, which dealt with the issue of whether insured homebuilders were covered under commercial general liability insurance policies for damages resulting from their application of defective stucco material to homes, the relevant insurance policies defined property damage as "[p]hysical injury to tangible property, including all resulting loss of use of that property." *Id.* Lennar, one of the plaintiff homebuilders, contended that all its costs were "damages because of ... property damage." *Id.* The

court distinguished between "three distinct categories of damages": (A) the costs to repair water damage to the homes, which constitute "damages because of ... property damage"; (B) the costs to remove and replace EIFS as a preventative measure, which do not constitute "damages because of ... property damage"; and (C) overhead costs, inspection costs, personnel costs, and attorneys' fees, which do not constitute "damages because of ... property damage." *Id.*

The Pughs assert that the definition of "property damage" as used in *Lennar* is similar to the definition of "property damage" used in the economic loss doctrine line of cases and, therefore, *Lennar* "is instructive" on what constitutes "other property damage" caused by the installation of and use of EIFS material. However, *Lennar* does not control our inquiry here because it involved a dispute regarding the existence of insurance coverage for EIFS related damage under the specific terms of a particular insurance policy. It does not provide any guidance on the issue of whether the economic loss doctrine bars the claims brought by the Pughs, as the purchasers of a home, against General Terrazzo, a manufacturer or supplier of EIFS. Finding *Lennar* distinguishable, we conclude, after considering the application of the economic loss doctrine by other Texas courts in the above cases, that the Pughs' negligence and strict liability claims are barred by the economic loss doctrine.[9] As the evi-

---

9. Although not controlling, we recognize that foreign jurisdictions that apply an economic loss doctrine in a similar fashion to Texas courts have specifically applied the doctrine to bar tort claims for purely economic losses against manufacturers and/or subcontractors in EIFS cases. *See, e.g., Wilson v. Dryvit Systems, Inc.*, 206 F.Supp.2d 749, 754 (E.D.N.C.2002) (concluding damage caused by EIFS system constituted damage to house itself and no "other property damage," and holding homeowners' claims barred by economic loss doctrine); *Weiss v. Polymer Plastics Corp.*, 21 A.D.3d 1095, 802 N.Y.S.2d 174, 176 (N.Y.App.Div.2005) (holding tort-based causes of action against EIFS manufacturer for damage for direct loss to stucco system and consequential damage to home's plywood substrate barred by economic loss doctrine); *Herman v. McCarthy Enterps., Inc.*, 61 Va. Cir.

dence in the record establishes, the Pughs had no direct contacts or contractual relationship with General Terrazzo. In fact, the Pughs did not have any direct contacts or contractual relationship with RBS, the applicator the Pughs allege to have negligently applied the EIFS. There is no evidence that the Pughs separately negotiated with General Terrazzo for the EIFS system or for General Terrazzo's supervision of or instruction on the application of the EIFS system. There is also no evidence that General Terrazzo was obligated to control RBS. Finally, there is no evidence that the Pughs sustained any personal injuries due to the improper installation of the EIFS system. Rather, all of the alleged damages are property damages to their home. Thus, under the controlling case law, there was no personal injury or damage to other property that would have permitted the Pughs to assert a tort claim that would be excepted from the economic loss doctrine. *See Murray*, 97 S.W.3d at 891; *Am. Eagle Ins. Co.*, 48 F.3d at 145; *Hininger*, 23 F.3d at 127.

Furthermore, although the Pughs were not in privity with General Terrazzo, their economic losses were the subject matter of their contract with Westbrook, and the Pughs have already obtained a judgment against Westbrook for their economic losses to their home. *See Hou–Tex, Inc.*, 26 S.W.3d at 107 ("Permitting Hou–Tex to sue Landmark for economic losses would disrupt the risk allocations that Hou–Tex worked out in its contract with Saguro and the risk allocations in Landmark's beta

agreement or licensee agreement with SeisVision's licensees."); *Hininger*, 23 F.3d at 127 ("Implicit in the [economic loss rule] is the policy judgment that in a commercial context the possibility of an inadequate recovery ... does not justify permitting a tort recovery that will allow a purchaser to reach back up the product and distribution chain, thereby disrupting the risk allocations that have been worked out in the transactions compromising that chain.").

■ Moreover, the Pughs' argument that General Terrazzo owed them a duty under a negligent undertaking theory does not save their negligence claims from the economic loss doctrine. First, we note that the Pughs do not specifically allege a "negligent undertaking" theory in their petition. Second, to establish a claim for a negligent undertaking, a plaintiff must show (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, (2) the defendant failed to exercise reasonable care in performing those services, and either (3) the plaintiff relied upon the defendant's performance, or (4) the defendant's performance increased the plaintiff's risk of harm. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 838 (Tex. 2000); *Tex. Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 284 (Tex. App.-Houston [1st Dist.] 2006, no pet.); *see also* RESTATEMENT (SECOND) OF TORTS § 323 (1965). As we have noted, there is no evidence that General Terrazzo undertook

697, 2002 WL 31974659 (Va. Cir. Ct.2002) (stating that, because there were no allegations that applicator's negligence in applying EIFS system resulted in personal injury or damage to "property other than the home itself" and that there were only claims for economic loss, homeowners did not have viable negligence claims against applicator); *see also Bay Breeze Condo. Assoc. v. Norco Windows, Inc.*, 257 Wis.2d 511, 651 N.W.2d 738,

746 (Wis.Ct.App.2002) (applying economic loss doctrine in building construction defect case "when defective product is a component part of an integrated structure or finished product," and holding homeowners' negligence and products liability claims against windows manufacturer for damages to interior and exterior of condo units caused by failed windows were barred by economic loss doctrine).

the task of rendering services to the Pughs. The record indicates that the Pughs contracted with Westbrook, Westbrook contracted with RBS, and RBS purchased the EIFS materials from General Terrazzo. The Pughs have not cited any authority for stretching a negligent undertaking claim so far as to apply to General Terrazzo under these facts. Thus, even assuming the Pughs adequately pled a negligent undertaking claim, we reiterate our holding that the economic loss doctrine bars the Pughs' tort claims. Accordingly, we hold that the trial court did not err in granting General Terrazzo's summary judgment motion on the Pughs' claims for negligence and strict liability.

We overrule the Pughs' second and third issues.

## Conclusion

We affirm the judgment of the trial court.