

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-345-CV

PAUL SCHAMBACHER                                     APPELLANT

V.

R.E.I ELECTRIC, INC. AND                               APPELLEES
GARLAND INSULATING, LTD.

**AND**

R.E.I. ELECTRIC, INC.                                   APPELLANT

V.

PAUL SCHAMBACHER                                    APPELLEE

------------

## FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

---

[1] *See* Tex. R. App. P. 47.4.

## I. INTRODUCTION

Appellant Paul Schambacher appeals the trial court's grant of summary judgment in favor of Appellees R.E.I. Electric, Inc. and Garland Insulating, Ltd. on his claims for breach of contract, breach of implied and express warranties, and negligence. R.E.I. appeals the trial court's grant of summary judgment in favor of Schambacher on its fraud counterclaim. We will affirm in part and reverse and remand in part.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 2005, Schambacher purchased a vacant lot at 932 Tealwood Drive in Keller. He decided to build a house on the lot and, along with his wife, executed a "Residential Construction Contract, Fixed Price" ("construction contract") with SCC Homes, Ltd. D.B.A. Sterling Classic Custom Homes ("SCC"). Under the July 2005 construction contract, SCC agreed to "construct improvements on" the lot in exchange for the Schambachers' agreement to pay SCC $513,580 (the "housing project").

In September 2005, SCC entered into an "Independent Contractor–Supplier Base Agreement" ("independent contractor agreement") with Garland whereby Garland agreed to perform work for SCC at SCC's request. The independent contractor agreement became effective from the date of its execution and continued until terminated by either party upon thirty days' written notice.

2

R.E.I. performed the electrical work on the housing project. It billed invoices to SCC on December 23, 2005; March 15, 2006; and March 22, 2006. Under the "Bill To" section of a February 27, 2006 R.E.I. invoice, "Sterling Classic Custom Homes" is crossed out and "Paul" is written in. According to Edwin Haugen, an R.E.I. representative, R.E.I had performed jobs for SCC in the past, but it had not entered into written contracts with SCC for those jobs.

Garland performed the insulation services for the housing project. It billed invoices to SCC on January 6, 2006, and March 21, 2006. At the time of trial Garland had performed insulation jobs for SCC for about two to three years.

On March 22, 2006, the house, which was "99.9 percent complete," was destroyed by a fire. Assurance Company of America ("Assurance"), Schambacher's insurer, pursued a subrogation action against R.E.I. and Garland, eventually settled and dismissed its claims against R.E.I. and Garland, paid Schambacher approximately $495,000 under the builder's risk insurance policy that Schambacher had obtained on the house, and assigned "the entirety of its claim," which included a fraud claim against Schambacher, to R.E.I. and Garland.

Meanwhile, Schambacher intervened in the suit and asserted claims against R.E.I. and Garland for negligence, breach of express and implied warranties, breach of contract, and violations under the Deceptive Trade Practices Act ("DTPA").[2] R.E.I. asserted a counterclaim against Schambacher for fraud based on a claim for

_____

[2] ... Schambacher raises no issue in these appeals regarding the DTPA claims.

reimbursement in the amount of $77,000 that Schambacher had submitted to Assurance and that Assurance had paid to him arising out of a fee that he had purportedly paid to SCC to serve as the general contractor for the housing project.

Discovery conducted by the parties showed that Schambacher has a "tight relationship" with SCC—he is a former superintendent for SCC and his brother, Scott Schambacher, owns SCC. Discovery also revealed that although both Schambacher and Scott (on behalf of SCC) identified SCC as the "general contractor" for the housing project, Schambacher and SCC had agreed to an unwritten "arrangement" that substantially limited SCC's duties as general contractor for the housing project. Specifically, according to Schambacher and SCC, SCC's role as general contractor was limited to (1) providing Schambacher with a list of subcontractors from which he could select and hire the subcontractor of his choice and (2) passing along invoices to Schambacher that it had received from the subcontractors who performed work on the housing project. As part of its providing Schambacher with a list of subcontractors, SCC allowed him to use its "buying power" to negotiate pricing with the subcontractors; in other words, Schambacher had permission to use SCC's name to obtain pricing discounts based on SCC's volume of work.

According to SCC, in light of its limited role, it had no oversight responsibility whatsoever for the housing project; it did not have a duty to select the subcontractors, to issue job-start orders, to monitor the progress of work on the

4

housing project, or to confirm that work had been completed. Instead, according to Schambacher, he exercised the duties of hiring the subcontractors, including R.E.I., and the general contractor, SCC; overseeing the construction of the house; and managing, communicating with, and paying the subcontractors, which he did using funds from his personal account. Schambacher did not discuss his arrangement with SCC with any of the subcontractors hired to perform work on the housing project.

Both R.E.I. and Garland filed motions for summary judgment on Schambacher's claims, and Schambacher filed a no-evidence motion for summary judgment on R.E.I.'s fraud counterclaim. R.E.I. and Garland challenged Schambacher's breach of contract and warranty claims on the basis of an absence of privity, and they challenged Schambacher's negligence claims under the economic loss doctrine. Schambacher included his affidavit in response to R.E.I.'s and Garland's motions, but the trial court sustained R.E.I.'s and Garland's objections to the affidavit and struck it. The trial court granted all of the motions for summary judgment. Schambacher and R.E.I. appeal.

### III. STANDARDS OF REVIEW

#### A. Traditional Motion for Summary Judgment

We review a summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex. 2009). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence

5

favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Id.* We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004); *see* Tex. R. Civ. P. 166a(b), (c). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Phan Son Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

## B.    No-Evidence Motion for Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

6

## IV. SCHAMBACHER AFFIDAVIT

In his first, second, and third issues, Schambacher argues that the trial court erred by striking his affidavit under the various theories argued by R.E.I. and Garland. We hold that the trial court's error, if any, in striking Schambacher's affidavit was harmless because the assertions contained in his affidavit that are relevant to the issues on appeal—that Schambacher and SCC had agreed to an unwritten "arrangement" that substantially limited SCC's duties as general contractor for the housing project, that SCC had no oversight responsibility for the housing project, and that Schambacher oversaw the housing project and managed the subcontractors, among other things—are additionally found in deposition excerpts that are part of the summary judgment record. *See* Tex. R. App. P. 44.1(a) (requiring appellant to demonstrate harm to obtain reversal on appeal). Accordingly, we overrule Schambacher's first, second, and third issues.

## V. PRIVITY—SCHAMBACHER'S CONTRACT AND WARRANTY CLAIMS

In his fourth and fifth issues, Schambacher argues that the trial court erred by granting summary judgment for both R.E.I. and Garland on his claims for breach of contract and for breach of implied and express warranties. He contends that his summary judgment evidence raised a genuine issue of material fact that he was the contracting party—and, thus, was in privity—with R.E.I. and Garland.

7

## A. Contracts and Warranties

Schambacher does not dispute R.E.I.'s and Garland's arguments that he must demonstrate privity to recover under his contract and warranty claims. The general rule is that only parties to a contract have the right to complain of a breach thereof. *Wells v. Dotson*, 261 S.W.3d 275, 284 (Tex. App.—Tyler 2008, no pet.); *see Jensen Constr. Co. v. Dallas County*, 920 S.W.2d 761, 772 (Tex. App.—Dallas 1996, writ denied) (reasoning that privity of contract is required for any recovery in an action based on construction contracts), *overruled in part by Travis County v. Pelzel & Assocs., Inc.*, 77 S.W.3d 246, 251 (Tex. 2002). Privity of contract is established by proving that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff. *Conquest Drilling Fluids v. Tri-Flo Int'l, Inc.*, 137 S.W.3d 299, 308 (Tex. App.—Beaumont 2004, no pet.)

Regarding breach of implied warranty claims, Texas courts have consistently held that a property owner may not recover from a subcontractor with whom the owner had no direct contractual relationship. *Glenn v. Nortex Foundation Designs, Inc.*, No. 02-07-00172-CV, 2008 WL 2078510, at *3 (Tex. App.—Fort Worth May 15, 2008, no pet.) (mem. op.) (citing *J.M. Krupar Constr. Co. v. Rosenberg*, 95 S.W.3d 322, 332 (Tex. App.—Houston [1st Dist.] 2002, no pet.), *Raymond v. Rahme*, 78 S.W.3d 552, 563 (Tex. App.—Austin 2002, no pet.), and *Codner v. Arellano*, 40 S.W.3d 666, 672–74 (Tex. App.—Austin 2001, no pet.)).

8

The supreme court has described an express warranty as part of the basis of a bargain, the result of a negotiated exchange, and, thus, contractual in nature. *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60–61 (Tex. 2008).

## B.    Garland

Garland's summary judgment evidence, which includes excerpts from Schambacher's deposition, the deposition of Dale Cox (Garland's representative), the construction contract between Schambacher and SCC, and the independent contractor agreement between Garland and SCC, demonstrates that Schambacher executed a contract with SCC in July 2005 for SCC to construct his house and that SCC thereafter entered into a contract with Garland in September 2005 for Garland to perform insulation services for SCC.  Cox testified that Garland understood that SCC was the general contractor for the housing project, that Garland sent its invoices to SCC, and that Garland never understood the situation to be any different. Garland met its summary judgment burden to show that it had contracted with SCC, not Schambacher, to perform insulation services on the housing project.

Schambacher argues that his summary judgment evidence raised a fact issue that he contracted with Garland to perform insulation services because Garland never dealt with anyone other than him in regard to the performance of insulation services on the housing project and because he, not SCC, was responsible for hiring the subcontractors, overseeing the construction of the house, managing and communicating with the subcontractors, and paying the subcontractors.

9

Schambacher directs us to Scott's deposition testimony that SCC was only responsible for providing Schambacher with a list of subcontractors from which he could select and for passing along invoices to him that it had received from the subcontractors. Because of his "arrangement" with SCC, Schambacher argues that the construction contract that he entered into with SCC, which neither R.E.I. nor Garland knew about, did not legally deprive him of the ability or capacity to contract with R.E.I. and Garland.

Schambacher's summary judgment evidence did not raise a genuine fact issue regarding privity with Garland because, though he may have had an "arrangement" with SCC that limited SCC's duties as general contractor, Garland had a written agreement with SCC to perform insulation services. The independent contractor agreement expressly provides that "[n]o variation, modification[,] or changes hereof shall be binding on either party hereto unless set forth in a document executed by all the parties hereto." There is no evidence that Garland varied, modified, or changed its agreement with SCC to contract instead with Schambacher for insulation services on the housing project, and there is no evidence—nor does Q2Schambacher even argue—that Garland's agreement with SCC somehow excluded Garland's insulation services for the housing project. The law presumes that a written agreement correctly embodies the parties' intentions and is an accurate expression of the agreement between the parties. *Estes v. Republic Nat'l Bank of Dallas*, 462 S.W.2d 273, 275 (Tex. 1970). Schambacher's actions in

10

selecting Garland to perform insulation services and overseeing the construction of the housing project did nothing to alter Garland's contractual relationship with SCC, which is further evidenced by Garland's billing each invoice to "Sterling Classic Homes" and not to Schambacher. We hold that the trial court did not err by granting Garland's motion for summary judgment on Schambacher's claims for breach of contract and for breach of express and implied warranties. Accordingly, we overrule Schambacher's fifth issue.

## C. R.E.I.

The summary judgment evidence presented by R.E.I. and Schambacher in regard to Schambacher's contract and warranty claims overlaps with much of the summary judgment evidence presented by Garland and Schambacher. There are, however, a few significant differences. First, R.E.I. states that it, "like all of the other subcontractors on the [housing] Project, contracted directly with SCC." According to R.E.I., if it had contracted with SCC, then it did not contract with Schambacher to perform the exact same work. But unlike Garland, R.E.I. has not produced any evidence of a written contract between it and SCC for the performance of services, nor have we located one after searching the entire record.[3] We therefore look to

---

[3] ... Schambacher's statement during his deposition that he thought the subcontractors had their agreements with SCC does no more than create mere surmise or suspicion of the fact. *See Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

11

evidence of an oral agreement, which leads to the second significant difference between R.E.I.'s and Garland's summary judgment evidence.

Unlike Garland's representative, who testified that Garland always understood its agreement to be with SCC, Haugen testified that he "realized" that R.E.I. was *not* working for SCC after it had received the first payment for its services on the housing project. Haugen testified that the payment came from Schambacher. After realizing that R.E.I. was not working for SCC, Haugen "just let it go" instead of making further inquiries. At that time, R.E.I. was 50 percent finished with its work on the housing project.

Another distinction of R.E.I.'s summary judgment evidence concerns the invoices. Garland billed each invoice to "Sterling Classic Homes," but under the "Bill To" section of a February 27, 2006 R.E.I. invoice, "Sterling Classic Custom Homes" is crossed out and "Paul" is written in.

Although the summary judgment evidence shows that Schambacher entered into the construction contract with SCC, the contract provides that "[Schambacher] shall be responsible for any liens and claims of liens for labor and materials for which [Schambacher] has contracted directly with another party." Schambacher testified that he hired R.E.I. to perform electrical services for the housing project. In light of this and Schambacher's and Scott's deposition testimony regarding their "arrangement," we reject R.E.I.'s argument that Schambacher's testimony that SCC

12

was the "general contractor" for the housing project in and of itself forecloses Schambacher's contention that he contracted with R.E.I.

Citing *Jensen Construction Co.*, R.E.I. contends that "[a]bsent an express agreement otherwise, in construction cases 'a subcontractor is not in privity with the owner.'" *See* 920 S.W.2d at 772. R.E.I. then argues that "Schambacher produced no evidence of an express agreement between [R.E.I.] and himself that would create a fact question as to whether he was in privity with [R.E.I.]" The problem with this argument is that the facts of this case render the rule delineated by the *Jensen* court inapposite. According to Haugen, R.E.I. never entered into written contracts with SCC when it contracted with SCC for the performance of services. Haugen testified that its agreements were instead "all" oral agreements. He also testified that Schambacher may have been the one who called R.E.I. and informed it that there was a "rough-in" available. Considering that R.E.I.'s representative testified that R.E.I. has a history of entering into oral agreements for the performance of services, R.E.I.'s contention that Schambacher must show evidence of a written contract to establish privity is completely inconsistent with its own history of contracting orally with general contractors for jobs.

The evidence presented in the light most favorable to Schambacher therefore shows, among other things, that R.E.I. did not have a written contract with SCC to perform services on the housing project, that Schambacher claimed to have hired R.E.I. to perform electrical services for the housing project, that Haugen realized that

13

R.E.I. did not work for SCC after receiving payment from Schambacher, and that R.E.I. billed at least one invoice to Schambacher. Indulging every reasonable inference and resolving any doubts in Schambacher's favor, we must conclude and hold that Schambacher's summary judgment evidence raised a genuine issue of material fact regarding whether R.E.I. contracted—and was therefore in privity—with Schambacher for the performance of electrical services on the housing project. Accordingly, we sustain Schambacher's fourth issue.

## VI. AGENT

In his seventh issue, Schambacher argues that if he failed to raise a fact issue regarding privity with Garland, then he at least raised a fact issue that he was an agent for SCC in his dealings with Garland and, therefore, that he has a sufficient interest in the subject matter of the contracts to prosecute a suit against Garland in his own name.[4] He cites *Perry v. Breland* for the proposition that there are four exceptions to the rule that an agent may not maintain a suit in his own name based upon his principal's contract: (1) when the agent contracts in his own name; (2) when the principal is undisclosed; (3) when the agent is authorized to act as owner of the property; and (4) when the agent has an interest in the subject matter of the contract. 16 S.W.3d 182, 187 (Tex. App.—Eastland 2000, pet. denied).

---

[4] ... Schambacher raised this argument in his response to Garland's motion for summary judgment.

The summary judgment evidence conclusively establishes that Garland contracted with SCC, not Schambacher, to perform insulation services and that SCC was disclosed as the contracting party with Garland. The third and fourth *Perry* exceptions are factually inapplicable to this case. The *Perry* court pointed out that "[a]n agent contracting for an undisclosed principal has the right to sue if it is apparent that the contract would be enforceable against him if the opposite party sued." *Id.* Notwithstanding that SCC was disclosed, Garland's contract with SCC would not be enforceable against Schambacher if Garland sued under the independent contractor agreement. *See id.* Accordingly, Schambacher failed to raise a fact issue that he was an agent for SCC in his dealings with Garland. We overrule Schambacher's seventh issue.

Having sustained Schambacher's fourth issue, we need not address his sixth issue arguing that a fact issue exists that he was an agent for SCC in regard to his dealings with R.E.I. *See* Tex. R. App. P. 47.1.

### VII. NEGLIGENCE AND ECONOMIC LOSS

In his eighth and ninth issues, Schambacher argues that the trial court erred by granting R.E.I.'s and Garland's motions for summary judgment on his negligence claims on the basis of the economic loss doctrine.

The mere fact that an act is done pursuant to a contract does not shield it from the general rules of tort liability. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) (reasoning that a party's acts may breach duties in tort or contract

15

alone or simultaneously in both, depending on the circumstances); *Thomson v. Espey Huston & Assocs., Inc.*, 899 S.W.2d 415, 420 (Tex. App.—Austin 1995, no pet.). One who undertakes to perform a contract assumes a duty to all persons to take reasonable care not to injure them or their property in the performance of that contract, and one who is not privy to the contract may assert a claim for negligence for a breach of that duty. *Goose Creek ISD of Chambers and Harris Counties, Tex. v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 494 (Tex. App.—Texarkana 2002, pets. denied); *see Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991). The court in *Thomson* reasoned that a property owner may assert a claim for negligence against a subcontractor based on the subcontractor's performance under its contract with a general contractor when the cause of action is independent of the duties imposed by the contract. *Jarrar's Plumbing*, 74 S.W.3d at 494; *Thomson*, 899 S.W.2d at 421–22.

A plaintiff's negligence action may, however, be barred by the economic loss doctrine, which has been applied by Texas courts in two related, overlapping contexts. *Pugh v. Gen. Terrazzo Supplies, Inc.*, 243 S.W.3d 84, 90–91 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). The doctrine has been applied to preclude tort claims brought to recover economic losses when those losses are the subject matter of a contract. *See Jim Walter Homes*, 711 S.W.2d at 618. When the injury suffered is only economic loss to the subject of the contract itself, the action sounds in contract alone. *Id.* The doctrine has also been applied to preclude tort

16

claims brought to recover economic losses against the manufacturer or seller of a defective product where the defect damages only the product and does not cause personal injury or damage to other property. *Pugh*, 243 S.W.3d at 91. The economic loss doctrine does not apply only to bar claims against those in a direct contractual relationship; it also applies to preclude tort claims between parties who are not in privity. *Id.* at 91 & n.7 (citing *Trans-Gulf Corp. v. Perf. Aircraft Servs., Inc.*, 82 S.W.3d 691, 695 (Tex. App.—Eastland 2002, no pet.) and *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 106–07 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).

Here, Schambacher only argues that both R.E.I. and Garland had a common law duty to perform services under their respective contracts with care, skill, and reasonable expedience and that their negligent failure to do so gave rise to an action in tort. Schambacher's argument misses the mark. His allegations against R.E.I. and Garland and argument on these issues do not assert that R.E.I.'s and Garland's negligence, if any, in performing the electrical and insulation services for the housing project caused any injury or damages beyond economic loss to the subject of R.E.I.'s and Garland's respective contracts. Schambacher's actions against R.E.I. and Garland thus sound only in contract. *See Jim Walter Homes*, 711 S.W.2d at 618; *Pugh*, 243 S.W.3d at 93–94. We hold that the trial court did not err by granting R.E.I.'s and Garland's motions for summary judgment on Schambacher's negligence claims, and we overrule Schambacher's eighth and ninth issues.

17

## VIII. FRAUD

In its only issue, R.E.I. argues that the trial court erred by granting Schambacher's no-evidence motion for summary judgment on its common law fraud counterclaim against Schambacher regarding the $77,000 claim for reimbursement that Schambacher submitted to Assurance based on the fee that he had purportedly paid to SCC to serve as the general contractor for the housing project.

The elements of a cause of action for fraud are (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party suffered injury as a result. *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001); *Dewayne Rogers Logging, Inc. v. Propac Indus., Ltd*, 299 S.W.3d 374, 391 (Tex. App.—Tyler 2009, pet. filed). Intent may be inferred from a party's actions before and after the fraudulent conduct and may be established by either direct or circumstantial evidence. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986). Although circumstantial evidence may be used to establish any material fact, it must transcend mere suspicion; there must be a logical bridge between the proffered evidence and the fact. *IKON Office Solutions, Inc. v. Eifert*, 125 S.W.3d 113, 124 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Intent tends to be a fact question uniquely within the realm of the trier

18

of fact because it so depends on the credibility of witnesses and the weight given their testimony. *Spoljaric*, 708 S.W.2d at 434.

R.E.I. included the affidavit of Steve Dickens in its response to Schambacher's motion for summary judgment. Dickens is an adjuster with Assurance and "was directly involved in the resolution of the insurance claim filed by [Schambacher]" for the fire at the Tealwood house. According to Dickens,

> 3) Schambacher submitted, along with his property damage claim arising from the Fire, a claim for reimbursement of a $77,000 fee he had purportedly paid to SCC Homes to serve as the general contractor in the construction of the house at the Property (the "Fee"). Assurance paid this claim for reimbursement of the Fee.
>
> 4) It was not until well after the payment of Schambacher's claim for the Fee, during the taking of discovery in the Subrogation Action, that Assurance was first made aware that Schambacher may have not paid the Fee to SCC Homes, or to anyone else, after all.

R.E.I. also included excerpts from Schambacher's deposition in its response to the motion for summary judgment. Schambacher maintained that he had paid a fee of $77,037 to SCC for SCC to act as the general contractor on the housing project. The following exchange occurred:

> [Counsel]: I'm going to show you what's been marked as Exhibit Number 10. Let me represent to you that this is one of the invoices that was produced to me. Can you identify that invoice?
>
> [Schambacher]: It says, SCC Homes, contracting fee - 932 Tealwood.
>
> [Counsel]: And is that an invoice from SCC Homes to yourself?
>
> [Schambacher]: Yes.

19

[Counsel]: And what is that invoice for?

[Schambacher]: For the - - being the sub- - - or being the contractor.

[Counsel]: How much is the invoice for?

[Schambacher]: $77,037.

[Counsel]: And explain to me what you mean it was for "being the contractor."

[Schambacher]: SCC was the general contractor on the house.

[Counsel]: This was the fee that you paid to SCC for acting as general contractor?

[Schambacher]: Correct.

[Counsel]: . . . When we talked about earlier that - - what you retained SCC to do was simply to provide a list of subcontractors and handle the invoicing for you; is that correct?

[Schambacher]: Correct.

. . . .

[Counsel]: And so the $77,000, what you're telling me, that was your fee to them for providing you with these lists of subcontractors and handling the invoicing?

[Schambacher]: Yes.

Schambacher testified that he had provided the invoices to Continental Adjusters to organize and sort and that they were ultimately submitted to Assurance.

R.E.I. also included excerpts from Scott's deposition in its response to Schambacher's motion for summary judgment. Scott testified that he had never

20

seen the $77,037 invoice and that, as far as he knew, SCC had never been paid the

$77,037.  The following exchange occurred:

> [Counsel]:  Can you explain what this contracting fee invoiced from SCC Homes is?
>
>    . . . .
>
> [Counsel]:  What is the basis of this invoice?
>
> [Scott]:  My understanding of my - - the fee that was supposed to be paid to us, which as far as I know we never received anything, was going to be based off of, you know, time involved . . . .
>
>    . . . .
>
> [Scott]:  This is the first time I've seen an invoice for that.
>
>    . . . .
>
> [Counsel]:  Do you know whether or not the company ever received $77,000 from your brother?
>
> [Scott]:  As far as I know, we've never received a dollar.
>
>    . . . .
>
> [Counsel]:  Are you prepared to disagree with your brother's representation that he and Susan Schambacher paid your company SCC $77,037?
>
> [Scott]:  As far as I know, I've never received any money.

We hold that R.E.I. presented summary judgment evidence raising genuine

issues of material facts that Schambacher made a material, false representation to

Assurance that he had paid SCC a fee of $77,037; that he knew the representation

was false when made; that he made the representation with the intent that

21

Assurance act upon it; that Assurance acted in reliance on the representation by paying the claim for reimbursement of the $77,037 fee; and that R.E.I., to whom Assurance had assigned its claims, suffered injury as a result of the representation. *See FirstMerit*, 52 S.W.3d at 758; *Spoljaric*, 708 S.W.2d at 434–35. We sustain R.E.I.'s sole issue.

## IX. CONCLUSION

We affirm in part and reverse and remand in part. Having sustained R.E.I.'s only issue, we reverse that portion of the trial court's judgment granting Schambacher's no-evidence motion for summary judgment on R.E.I.'s fraud counterclaim. Having sustained Schambacher's fourth issue, we reverse that portion of the trial court's judgment granting R.E.I.'s motion for summary judgment on Schambacher's claims against R.E.I. for breach of contract and for breach of implied and express warranties. We remand this case for further proceedings concerning those claims as well as R.E.I.'s fraud counterclaim. Having overruled all of Schambacher's other issues, we affirm the remainder of the trial court's judgment.

BILL MEIER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and MEIER, JJ.

DELIVERED: August 5, 2010

22